[No. 23843. *En Banc.* December 23, 1932.]

THE STATE OF WASHINGTON, *Respondent,* v. OLLIE LEE STRATTON, *Appellant.*[1]

[1]Reported in 17 P. (2d) 621.

*Joseph H. Johnston, Wm. J. Conniff,* and *A. Henry Packard,* for appellant.

*W. J. Daly, Jr.,* for respondent.

MITCHELL, J.—The information in this case charged Ollie Lee Stratton with the wilful, felonious and premeditated killing of William Frawley, August 26, 1931, in Jefferson county, Washington. On arraignment, the defendant entered a plea of guilty, but thereafter, on leave granted, the pleas of not guilty and of mental irresponsibility were substituted. The trial resulted in a verdict of guilty of murder in the first degree and a special finding or verdict that the death penalty be inflicted. The appeal is from a judgment ordering the death penalty.

The facts are about as follows: The deceased was a retired soldier, living in Port Townsend. The defendant was an ex-soldier, and had served with the deceased in the ordnance department at Fort Casey, Washington, and at the time of committing the crime, being unemployed and without funds, was living with his parents at Port Townsend. On the morning of the homicide, he procured from a hardware store a rifle and a box of shells, went to the home of the de-

ceased, and shot him in the head from behind, wrapped the body in a blanket, placed it in a Ford coupe belonging to the deceased, gathered up personal effects of the deceased he wanted, including a small amount of money, and left the premises. He drove to the home of his parents, told his mother the car belonged to a friend, and that he was going to look for work and to see his sweetheart. He drove the coupe on to the ferry at Port Townsend, crossed over an arm of the sound to Whidby Island, and disposed of the body of the decedent by throwing it down a bluff on to a garbage dump on the beach, and then went down the bluff and covered the body with boards and an old bed spring; or, as appellant testified, he, appellant,

". . . goes to the ferry and went over and picked out the place and put him there. It didn't look right to me, it got me, so I went down and fixed him up, and went up to the girl's place."

He and his sweetheart then drove the coupe to Seattle, and shortly after arriving there, he went to a bank, represented himself to be William Frawley, the deceased, left a pass book of the deceased with the Seattle bank, and signed a draft for collection on the deceased's account in a Port Townsend bank. He thus got a small amount of money within a few days, at which time he attempted through the Seattle bank to withdraw a larger amount of funds from another account of the deceased in Port Townsend, and at this time was arrested by a Seattle detective, to whom he stated that his name was William Frawley. Upon being taken to police headquarters, he still insisted that he was William Frawley, and exhibited personal property of the deceased, consisting of bank pass books, Masonic lodge card, and other articles as means of identification.

Shortly, the sheriff of Jefferson county, with whom the appellant was acquainted, arrived; and then the appellant changed his story about the articles, saying they had been given to him by two men he met on the ferry. He was taken back to Jefferson county by the sheriff, and at first maintained that he did not know the whereabouts of the deceased, but later confessed the crime, giving much of the details, and offered to take the officers to the place where he had hidden the body, if permitted to do so without being handcuffed. He went with the officers to the place, and on walking away with the sheriff after the body had been uncovered, the appellant started talking to himself, and said: "Money, money is the cause of it all," according to the testimony of the sheriff.

Appellant, while testifying at the trial, admitted many of the most incriminating facts and circumstances of the crime, while as to others he generally said that he did not remember.

■ A non-expert witness was called on behalf of the appellant and almost at once, upon reference being made to the appellant, was asked, "What was his disposition, to your knowledge?" and "I will ask you, did he appear to be good natured?" Objections were sustained to the questions as calling for conclusions, and error is assigned upon the rulings. No offer of proof was made in this respect after the objections were sustained; and besides, thereafter the witness was permitted to testify, without objection, very fully with respect to the conduct and conversations of the appellant with reference to a great many persons and things, after which no question of similar import to those objected to was asked. The assignment is without merit.

■■ The next assignment is that, in one of the instructions, the court did not accurately define mur-

der in the second degree. That is not important now, as the verdict, supported by an abundance of evidence, finds the appellant guilty of a higher crime, namely, murder in the first degree. In addition, appellant requested no instruction upon the subject matter of the one now objected to, nor was any exception whatever taken to that portion of the instruction now complained of, and therefore it cannot be reviewed. *State v. Goddard*, 132 Wash. 286, 231 Pac. 794, and cases cited; and *State v. Sholund*, 153 Wash. 398, 279 Pac. 591.

■ Complaint is made of instructions Nos. 5 and 8, in that each, it is claimed, constituted a comment on the evidence, contrary to the constitution. It is urged that the first was a comment on the method of killing the decedent, and states the fact to be that the defendant was killed by shooting. We do not so understand the instruction. The information charged that the killing was done by shooting, and the instruction as to this feature specifically says: "So, if you find from the evidence, beyond a reasonable doubt, that the defendant killed William Frawley as charged in the information, then," etc., thus leaving the question to the jury.

■ Nor was there any comment on the evidence in that portion of instruction No. 8 referred to by appellant. The criticism, in effect, is that the court took from the jury, or by comment on the facts guided the jury in determining, the question of whether or not the defendant did kill the deceased. But even this detached portion of the instruction, cited by appellant, should not be construed as giving any such impression to the jury, and surely it cannot be so considered when taken in connection, as the rule requires, with another instruction just given to the jury that, in order to find the defendant guilty of murder in the

first degree as charged in the information, they must be convinced beyond a reasonable doubt of all the elements of that crime, enumerated by the court and among them, ''(1) That the defendant on or about the 26th day of August, 1931, did shoot and kill William Frawley, a human being.''

It is further assigned that the court erred in denying a new trial on the ground of misconduct of the prosecuting attorney. The assignment refers to a part of the prosecuting attorney's argument to the jury as follows:

''I think it is saddest of all when we think of the life being snuffed out of old Bill Frawley without a chance, standing there in his home, filling his pipe, stricken down and life taken from him, his life in the hands of this defendant, who took it for the sole purpose evidently of getting his money.

''Now consider his after acts, he wrapped the remains up in a blanket, and takes it to Island County. Had he dug a shallow grave and buried him it would not have been so bad, if he had only thrown a little bit of earth over him, and let him lie like a soldier, but what does he do, dumps him over a garbage to become food for rats and carnage for gulls, let him lie in the sun and rot, and let the vermin eat him until he is unrecognizable. Poor old Bill Frawley, an honest volunteer of the United States Army, and not even entitled to a decent burial. It seems sad, members of the jury, that we have in this county in which we walk, human beings that would stoop so low. We have the problem before us now, before you today in this small city of Port Townsend, this problem for consideration and the eyes of the entire state are focused upon you, and God is above giving you strength that you may walk fearlessly and conscientiously forward, and with upright hands and honest hearts perform your duty, to the best of your ability. If you acquit this man by reason of his mental irresponsibility, you are confronted with the same situation that was confronted in the Garrison case, where Ruth Garrison ruthlessly mur-

dered the wife of her sweetheart and afterwards— THE COURT. I don't think that you should bring that up here. MR. DALY. Very well. If you find this man guilty as charged and then he should be sentenced to life imprisonment in the state penitentiary have you performed your sworn duty,—the average term of years that a lifer spends in the penitentiary does not exceed eight years, and after this defendant has been in there for a few years he can appear before a sympathetic parole board and turned out to again do the same act that he did here in this county. Bear in mind, ladies and gentlemen of the jury, that this man is now an assassin, he has tasted blood, and he finds it sweet. He is now twenty-two years of age, ten years in the penitentiary and he comes out at thirty-two able to pursue the same ruthless career that he pursued here. It is hard for me to ask this, and it may be hard for you to do, but when you equalize all of the facts here when you retire to deliberate upon your verdict in this case, I cannot help but feel that you have only one alternative, and that is to give the life of this defendant to the state of Washington; not in any spirit of revenge, not in any spirit of vengeance, but that you and I and your friends may be able to walk and know that there is a law flooded around you that will protect you and me from such acts as this, and your verdict act as a deterrent to young men who are actuated to do similar crimes to this one, for the sole and only purpose of securing money.''

No exception was taken to the argument, nor request made that the court instruct the jury to disregard it, which is necessary to have it reviewed unless it amounted to conduct so flagrant that an instruction would not cure it. *State v. Heaton,* 149 Wash. 452, 271 Pac. 89, quoting the rule laid down in *State v. Meyerkamp,* 82 Wash. 607, 144 Pac. 942. We are satisfied the language of the prosecuting attorney did not constitute misconduct of such flagrance.

Furthermore, the contentions of the appellant, as we understand, are: (1) That the argument was

an undue appeal to passion and prejudice. But an attorney is not confined in his argument to a simple recitation of, or reference to, the testimony, but may draw deductions therefrom, and persuade after the manner of advocacy suggested by the facts and circumstances testified to on the trial.

■ (2) That the argument constituted statements of fact not in evidence, that the remarks constituted testimony on the part of the prosecuting attorney, who was not under oath and not subject to cross-examination; and in this connection, it is further claimed that the facts thus testified to by the prosecuting attorney were not true, because, under the statute, there could be no parole of a life prisoner. The suggestion that the law prohibits the parole of a life prisoner may be dismissed in our consideration of the case, because if the jury knew that, they would, of course, pay no attention to it. But suppose they listened, without knowing such to be the law, still there was nothing prejudicial or that constituted reversible error about the argument.

The jury was sworn, as the law requires, to try the case according to the law and evidence given on the trial. The jury knew what the term evidence meant; for, beside common knowledge, they had seen a large number of witnesses called in this case, sworn and take the witness stand and testify. They knew what the prosecuting attorney said was not evidence, but only argument. The jury had just been instructed by the court that they were the exclusive judges of the evidence, and of the credibility of the witnesses, and the weight of their testimony; and that, in weighing the testimony of a witness, they had the "right to consider his demeanor upon the witness stand," etc. They had also just been further instructed:

"You are further instructed that each of you has taken an oath that you will well and truly try this case and a true verdict render upon the evidence and upon the law as given you by the court. You should not allow yourselves to be swayed by sympathy or influenced by prejudice, the question of guilt or innocence is a question of fact, to be determined from the evidence, or lack of evidence, and that alone, without bias, prejudice, or sympathy and regardless of what the penalty should be."

The instruction was clear that the case was to be tried upon the evidence and upon the law as given by the court, and there is nothing in the record to reasonably suggest that the jury did not follow the instructions.

Authorities abound, as appellant's brief indicates, in reversals in criminal cases where the conduct of the prosecuting attorney was found by the court to have prevented fair trials. There can be no question of the correctness of that rule, but the primary question in all such cases was whether the conduct complained of was prejudicial, and the solution of that kind of question applied to the present case is, in our opinion, not helped by the authorities cited on behalf of appellant.

There are cases, however, that present situations so nearly similar to the present one that we find them of considerable help in disposing of the question here. In *State v. Junkins*, 147 Iowa 588, 126 N. W. 689, the prosecuting attorney, in his argument to the jury, urged that the death penalty should be inflicted, because, if life imprisonment was the verdict, the defendant would in time be pardoned or paroled. Counsel for the defendant objected to the argument, and was overruled. The appellate court, in affirming the judgment assessing the death penalty, said:

"While several errors are assigned, the only one argued other than as pertains to the measure of pun-

ishment has reference to the alleged misconduct of the prosecuting attorney in argument to the jury. The language objected to was in effect that the death penalty ought to be inflicted because in the event of life imprisonment there was a possibility that appellant might in time be pardoned or paroled. The argument was one which would better have been omitted, and we can conceive of circumstances under which, especially where the case involves other doubtful features, we would be disposed to hold it prejudicial error for the trial court to permit it, but we are united in the view that under the record here presented there is no reasonable probability that the verdict would have been otherwise, had the appellant's objection to the argument been sustained.''

In *Wechter v. People*, 53 Colo. 89, 124 Pac. 183, a murder in the first degree case with death penalty assessed, the prosecuting attorney made an argument of the kind in question, which was objected to by the defendant's attorney, thus drawing the prosecuting attorney into a colloquy with the court and defendant's attorney, becoming almost ugly to the latter. It was held that the conduct in that case was improper and should have been stopped, but that it was not reversible; and stating further with reference thereto as follows:

''That a person sent to the penitentiary would be released before serving his time had nothing whatever to do with any question involved, and it certainly was not proper to criticise counsel for defendant because he made an objection which he was entitled to make. We think, however, that this argument could not in any way have influenced the jury in returning the verdict they did. They would not have sentenced the defendant to be hanged instead of to the penitentiary, unless they believed from the testimony the crime of murder was committed under such circumstances that the death penalty should be imposed. Men sworn to perform their duty and render a verdict according to the testimony and the law as given them by the court,

will not be influenced by such argument or statements on the part of the prosecuting attorney to which we have referred, to render a verdict other than that which the testimony and the law justify.''

In another case of murder in the first degree, *Jacobs v. State,* 103 Miss. 622, 60 So. 723, a somewhat similar situation arose which was explained and disposed of by the supreme court as follows:

''In the closing argument for the state, the district attorney used this language: 'Gentlemen, you have the *power* to bring in a verdict of guilty as charged, and fix the punishment of defendant at life imprisonment in the state penitentiary; but you have not the *right* to do it under the facts in this case, just as I have the power to slap an infant child down, but I have not the right to do it;' and, 'I am becoming wedded to capital punishment. I will never accept another sentence of life imprisonment where the evidence shows the man to be guilty of cold-blooded murder. I am getting tired of penitentiaries. There is no use to send a man there. You can send a man to the penitentiary for life, and he will only stay there a short while, and be pardoned; and a dead man can't get pardoned.' This language invokes *lex talionis,* and while the law of this state is not so harsh and near so vindictive as the learned and eloquent district attorney would like, we cannot say that the lurid language of the advocate contributed to the conviction of this defendant. It may reasonably be maintained that intemperate speech reacts to the confusion of the speaker quite as frequently as it prejudices the cause of the person against whom it is fulminated.''

In *Russell v. State,* 201 Ala. 572, 78 So. 916, the supreme court held there was no reversible error in the refusal of the trial court to strike the prosecuting attorney's argument to the jury to the effect:

'' 'Defendant's counsel argues that he should be sent to the asylum. Send defendant to the asylum and then let a few doctors come along, and in a few

months or few years, and give another opinion, and have him discharged from the asylum and turned loose on this neighborhood.' "

In the present case, the first part of the argument claimed to have constituted prejudicial conduct, though not objected to, was seasonably stopped by the court. As to the remainder of the argument, it did not suggest to counsel for appellant the need or idea of any objection. The convincing effect of the evidence against the appellant, contributed to substantially by himself, independent of any argument on the part of the prosecuting attorney, clearly justified and manifestly brought about the verdict. The trial court, believing the trial was without error, prejudicial or otherwise, denied the motion for a new trial.

Finding no error in the record, the judgment appealed from is affirmed.

HOLCOMB, MAIN, STEINERT, MILLARD, and PARKER, JJ., concur.

BEALS, J. (dissenting)—In my opinion, the attorney for the state was, in the course of his argument to the jury, guilty of such misconduct as entitles appellant to a new trial. One of the principal questions to be determined by the jury was whether or not the death penalty should be inflicted. The fact of the killing was practically admitted by appellant, and his plea of mental irresponsibility was not very vigorously maintained. In arguing for the infliction of the death penalty, counsel for the state, in the portion of his argument quoted in the majority opinion, stated that the average term served by a convict under sentence of life imprisonment does not exceed eight years, and that appellant, if sentenced to life imprisonment, would in a few years be eligible for parole. Even if correct in point of law, this argument covered a mat-

678

ter which the jury had no right to consider. The argument was wrong from every possible standpoint, and, in my opinion, was so prejudicial that it must be held that the appellant did not have that fair trial guaranteed him by the constitution. In my opinion, appellant is entitled to a reversal of the judgment from which he has appealed, and to a new trial.

TOLMAN, C. J. (dissenting)—I concur with Judge Beals upon the theory that the statements made in the argument of the prosecution were such that we must presume they were prejudicial upon the issue of whether or not the death penalty should be inflicted.

[1]Reported in 17 P. (2d) 843.