[No. 24510. *En Banc.* December 15, 1933.]

THE STATE OF WASHINGTON, *Respondent,* v.
TED BRADLEY, *Appellant.*[1]

[1]Reported in 27 P. (2d) 737.

482

*Henry Clay Agnew,* for appellant.

*Robert M. Burgunder, William J. Wilkins,* and *John D. McGillivray,* for respondent.

HOLCOMB, J.—Appellant was charged in the court below, by information filed March 28, 1932, of the crime of murder in the first degree, as follows:

"He, said Ted Bradley alias George Everette Slate, in the county of King, state of Washington, on or about the 17th day of March, A. D. 1932, while then and there wilfully, unlawfully and feloniously engaged in committing, attempting to commit and withdrawing from the scene of the commission of a felony, to-wit: Robbery of one G. Ikeda, did wilfully, unlawfully and feloniously shoot at, toward and into the body of G. Ikeda, a human being, with a pistol then and there loaded with powder and ball and then and there had and held by him, the said Ted Bradley alias George Everette Slate, thereby mortally wounding the said G. Ikeda from which said mortal wounds the said G. Ikeda languished and died on the 18th day of March, A. D. 1932."

The presiding judge of the superior court for King county was the same at all times during the preliminary matters occurring in this cause up to the time of the commencement of the trial, a judge of long acquaintance with the bar of King county.

The record shows that, on May 17, 1932, appellant appeared with his present counsel to be arraigned upon the information in open court. A certified copy

of the information was served upon appellant, and he was given seven days in which to plead. Upon the day set for him to plead, he appeared before the presiding judge, refused to plead, and stood mute, whereupon the court ordered the entry of a plea of not guilty.

On June 9, 1932, the matter was brought on by the state to be set for trial, and was thereupon set for trial on July 25, 1932. At the time the cause was set for trial, appellant had just been removed from the hospital, where he had previously been confined as the result of gunshot wounds, to the jail. His present counsel then informed the presiding judge that appellant had made definite arrangements to obtain money the first of September to employ him as his attorney, and that it was impossible for appellant to get any money sooner. The court at that time notified present counsel for appellant that the case would be set for trial in July, that the money would have to be obtained by that time, and that no further time would be given; counsel then, in open court, notified the court that in all probability he would withdraw from the case.

On July 15, 1932, appellant's present counsel withdrew, whereupon, on July 19th, Mr. A. A. Booth, a practicing attorney of Seattle and King county, was appointed counsel for appellant by the presiding judge, and was so advised by the prosecutor's office on July 19th. The deputy prosecutor, who had charge of this prosecution, called Mr. Booth by phone on July 19th, inquired of him if he could prepare his case for trial by July 25th, the day it was set for trial, and, if not, the deputy prosecutor would immediately request the presiding judge to appoint another counsel to assist him; to which Mr. Booth replied that he supposed he could be ready, and did not desire any

other counsel. No request of any kind, either verbal or written, for a continuance of the trial of the cause, was ever made by his counsel, and on the morning of the trial, Mr. Booth announced that he was ready to proceed.

The evidence in this case is positive, definite and uncontradicted that appellant had, on the same day about noon, entered the storeroom of the Ikedas, who owned the little store where Ikeda was killed, tried to open the cash register, could not open it, and the wife of the proprietor ran out and had a lady call the police. Appellant, a young man twenty-four years old, had committed three previous robberies in the same premises by intimidation and threats against the Ikedas, on March 5th, March 10th and March 15th, obtaining only small sums of money in each robbery.

On March 17th, after he had made an attempt to open the cash register, the Ikedas notified the police, and asked for police protection. Accordingly, the captain of the detective force assigned two officers, Detectives Sands and Rehmke, to put a stop to the robberies. They were instructed by the captain to take a sawed-off shotgun with them and to take no chances, but to shoot only if necessary. They did not take any sawed-off shotgun with them, but took their ordinary revolvers, which were special police Colt .38 automatics. They arrived at the store a little before six o'clock, and persuaded the storekeepers to leave the outer door open to allow appellant free entrance. Having learned that it was the custom of appellant to herd the storekeepers into the back room of the store by threats and intimidation and there go through their pockets, the officers placed themselves in this back room.

About six o'clock, appellant appeared at a distance of about a block from the store. He was seen coming,

and Ikeda was told. When he entered, Ikeda and his assistant, a young Japanese about sixteen years of age, named Tommy, were in the front room. Officers Sands and Rehmke, together with the landlord Sanders, who had noticed that there was some prospect of another hold-up and had come into the premises, and Mrs. Ikeda, were in the back room. Mrs. Ikeda warned the officers that appellant was coming.

Immediately upon entering the store, appellant told Ikeda and Tommy to "stick 'em up," and then drove them ahead of him into the rear room with his gun in his hand. As Ikeda and Tommy passed through the door ahead of appellant, appellant saw the officers within the room and instantly "blazed away" with his gun. Shooting first at Officer Sands from the doorway, he fired one shot, and possibly two more, before Sands fired at him. Sands, who was taken by surprise by the first shot of appellant, went into a crouching position and fired only after appellant had fired twice. The shooting was very fast, and after appellant had fired a second shot, Officer Sands fired twice, aiming low at appellant as he stood in the doorway. By this firing, he drove appellant out of the doorway.

Then Rehmke, who had stationed himself behind the door and who had been swaying the door to attract the attention of appellant, was shot in the wrist. Rehmke, taking careful aim, shot at appellant, who fell. Rehmke then held his fire, thinking appellant would quit. Appellant, however, rolled over, lifted himself part way up, and shot at Rehmke. Rehmke was hit in the chest and knocked backward. The door went closed after Rehmke was hit. Ikeda was then moaning on the floor.

Appellant got up, left the store, and was pursued by Sands. As appellant ran up the street, he fired

twice with his gun at Sands, who was following him, and Sands fired twice at him. Appellant entered a big black sedan that had been pulled up by the curb on the wrong side of the street, and, as Sands could not see appellant any longer, he withheld his fire. The car was the same car that had been employed by the appellant on the other occasions when he had committed the robberies on the Ikedas, driven by a driver named Preston. Appellant directed this driver to take him to his home, situated at 2114 Seventh avenue, Seattle, where the driver had called and gotten him on the several previous occasions.

As appellant got into the car, he told the driver that ''I got in a beef and he plugged me.'' He directed the driver to take him to his home, which the driver did, and a woman by the name of Ethel French, with whom appellant had been living as man and wife, came down and had appellant taken to their apartment. Asked as to whether he had been hurt, appellant replied, ''Hell no, drunk again.'' Ethel French instructed the driver to call a doctor whose name was written on a piece of paper.

Meantime, it had been discovered that Ikeda had been shot through the stomach. He was taken to the hospital, where he died at one o'clock the following morning. An X-ray picture was taken of the body of Ikeda, and the bullet located. It was removed by the autopsy surgeon and a deputy coroner, and immediately marked for identification. The deputy coroner turned it over to Mr. May, a criminologist, for examination. Mr. May was an expert on the subject of guns and bullets, having made a study of that question for the purpose of determining whether a bullet came from a particular gun. His qualifications were not challenged or disputed.

When the detectives searched the premises of ap-

pellant, they found a .32-calibre automatic revolver under the mattress. The bullet that killed Ikeda was a .32-calibre bullet, and it was positively testified to as having come from the gun of appellant. The officers, as has been stated, used .38-calibre special police guns.

Appellant was arrested and taken to the city hospital. When questioned by the captain of the detectives about his business, he stated, voluntarily and without equivocation, that he was a "stick-up man." He also said that he had "made the place before several times," and laughed about it. He further said that he knew it was a "plant" as soon as he got in there that day. The next day, when talking to his half-sister and a detective who accompanied her, he said, "I got that son of a bitch I was after." His sister remonstrated with him, and asked him not to talk that way. Appellant then said, "If I had had a .45 I would have got away. That .32 was too small. If I get out of this, I will carry a gun with wheels on it."

During the time appellant was confined in the county jail, he wrote a letter which he gave to a trusty to deliver, who turned it over to the jail superintendent. The letter reads:

"Seattle, Washington,
"Claude Hoover:                    July 7, 1932.
"I am a friend of Dinks and when I left him he gave me a kite for you, but I never got as far as Spokane. He said if I needed anything you would help me. I need help now in the worst way. I was on a stick-up job here in Seattle and had a little argument with the law. When the smoke cleared away there was one guy dead and a cop had a bum wing so I am in jail on a first D murder charge. I was in the hospital for eight weeks and just got out of the hospital. I am not singing the blues to you. I am just trying to tell you the fix I am in. The guns around here are afraid of their own shadow so if you can get me four (4) Humming

Bird Royal hacksaw blades size five I would sure appreciate it and you wouldn't lose anything by it. I am out of money and everything else but if you want to take a chance on helping me I will see you don't lose anything by it. I know it is not right to ask that much of a stranger but I am just down to rock bottom. I have as much chance of beating the rap as a snow ball in hell. The kid wrote to you a few days ago. If you can and will get those blades send them to my sister in Tacoma, Wash., 2611 Est. C St., Miss Myrtle Simonsen, and she will see that I get them or if things are slow up your way bring them yourself and go to see my sister and she will bring you up to see me. If you come yourself the bulls won't let you see me as I am in 'sol.' Just my folks and the kid get to see me. I have been in some hot spots but this is the hottest I have been in. Here is hoping you will do something. I am trying to send this out by a trusty. He seems to be good people.

"A friend,<br>
"(Sigd) TED BRADLEY,<br>
"King County Jail, Seattle, Wash.

"P. S.—If you answer, answer to my sister's address, Miss Myrtle Simonsen, 2611 Est. C. St., Tacoma, Wash."

In his statement of the case, present counsel for appellant frankly states that, at the time he considered himself tentatively engaged to defend appellant, he considered that

". . . the proof [of the facts] thereof in the hands of the state was so overwhelming, that the only question for determination, then apparent to the writer, was the penalty to be assessed by the jury—hanging, or life imprisonment—and the case was so understood by appellant."

It is also stated that "the writer felt that no one could win for him a verdict short of guilty, and that any one could save him from the penalty of death."

Counsel also argues that, although Mr. Booth, who was appointed to defend appellant, is a reputable at-

torney of more than twenty-five years' practice at the Seattle bar, his practice has been confined to the civil side of the law; that this was the first criminal case he ever tried in his life, and he takes no offense when counsel says that his efforts made at the trial left much to be desired in the way of a record; that he himself confessed his inadequacy before the jury.

The entire record in this case has been read with serious care. Had any other verdict than conviction of murder in the first degree been rendered by the jury, which was composed of eight male and four female jurors, it would have been a travesty on justice. Whoever defended appellant, had a most desperate case to defend. As has been said, Mr. Booth is a reputable attorney of more than twenty-five years' experience at the bar. We have read his entire argument to the jury, and consider it as eloquent and persuasive an argument as possibly could have been made to any jury in the land. There simply was no defense to be made as to the crime itself. The jury returned a verdict of guilty of murder in the first degree, and also a special verdict recommending that the death sentence be imposed.

The first error urged by appellant is in appointing counsel for appellant in his absence, in violation of his constitutional right to be present. It may be doubted whether it was necessary that appellant be present at such a preliminary proceeding. While the record is somewhat deficient in that respect, it is not to be presumed that counsel was appointed for appellant without his presence. He was present, when first arraigned, with his present counsel, and also present with his present counsel when he stood mute and refused to plead. In the absence of an affirmative showing to the contrary and to the prejudice of the accused, this court will not presume error in

the possibility of counsel being appointed for appellant for his defense in his absence. *State v. Schafer,* 156 Wash. 240, 286 Pac. 833 (a case not cited by respondent).

The second complaint is that the court erred in appointing counsel for appellant without consulting appellant's wishes, in violation of the statute pertaining thereto. When it appeared that no fee would be forthcoming from appellant and his relatives by September 1st, his counsel had the legal and moral right to withdraw as he did, and promptly notified the court. Under those circumstances, and after present counsel had withdrawn, there was nothing for the presiding judge to do but to appoint counsel for appellant, whose constitutional right to counsel was thus accorded. It is to be presumed also that the counsel appointed by the presiding judge, who was a reputable, practicing attorney for more than twenty-five years, was able to conduct the defense, even of a criminal case, sufficiently skilfully and properly. *State v. Kelch,* 95 Wash. 277, 163 Pac. 757; *State v. Blight,* 150 Wash. 475, 273 Pac. 751. See, also, *State v. Schafer, supra.*

As to this assignment, counsel quotes extensively from *Powell v. Alabama,* 287 U. S. 45, 77 L. Ed. 158, to the effect that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice. While we concede that is good law, the decision itself in that case was sharply questioned and criticized as to the right of that court to take jurisdiction of such a case, under the Federal constitution, by two of the ablest justices of the court. There was no such designation of counsel in the case at bar as was referred to in the cited case, where the designation attempted was either so indefinite or so close upon the trial as to amount to a

denial of effective and substantial aid in that regard. In that case, the entire bar of the county where the prosecutions were pending, were appointed to defend the accused. We agree with the decision that such an appointment was entirely too vague and uncertain to constitute an actual designation of counsel for an accused. We have no quarrel with that statement, but, in all other respects, we are not bound by the rule of decision of that court, but by our own rule in such matters.

The only statutory provisions here, relating to the appointment of counsel for an accused in a criminal case, where the accused is without and unable to employ counsel, are Rem. Rev. Stat., §§ 2095 and 2305, both of which were complied with in this case. No statutory right of appellant was therefore violated.

■ The third complaint of appellant is that the court erred in refusing to grant the motion for a new trial because of misconduct of the prosecuting attorney in insisting upon pursuing an improper line of inquiry in defiance of the ruling of the court. An examination of the record shows that nothing of the kind occurred. The first question asked by the prosecutor, upon objection, was abandoned. The next related to an entirely different incident asked of the mother of appellant when she was testifying on cross-examination, to which she gave a very emphatic negative answer, which cured whatever error there might have been had it been answered affirmatively. *State v. Shimoaka,* 141 Wash. 337, 251 Pac. 290; *State v. Brames,* 154 Wash. 304, 282 Pac. 48; *State v. Tweedy,* 165 Wash. 281, 5 P. (2d) 335. A third question elicited an answer favorable to appellant by which the state was bound.

■ The fourth complaint is that the court erred in refusing to grant the motion for a new trial because

of the error of the witness Ernest Yoris in injecting into the evidence the previous conviction of appellant. This witness, while relating a conversation had with appellant at the hospital, volunteered the statement, "He told me he had a record. I asked him where from. He gave me his record." Upon this statement being made, Mr. Booth objected, and the prosecutor advised the witness not to go into that part of the conversation. The witness, however, volunteered: "That is how I found out who he was."

Those were irresponsive answers, not elicited by any questions of the prosecutor. Error cannot be predicated upon the fact that a witness gave an improper answer when the question was a proper one, and neither the court nor the examiner was at fault. 40 Cyc. 2447; *State v. Priest,* 132 Wash. 580, 232 Pac. 353; *State v. Nelson,* 133 Wash. 30, 233 Pac. 12; *State v. Claughton,* 153 Wash. 473, 279 Pac. 734.

The fifth complaint is that the prosecutor was guilty of misconduct on the direct and redirect examination of the witness Ethel French, because of which a new trial should have been granted. Counsel asserts that, through this witness, the prosecution got to the jury the fact that appellant had a criminal record. There is nothing whatever in the questions and answers to and by Ethel French that appellant had ever been confined in the penitentiary or had a criminal record. She was the woman who lived with appellant where he was arrested, where the gun was found, who had him removed from the taxicab in which he went and came from the scene of the homicide, and she said nothing in answer to any question that would, in the slightest degree, be harmful to appellant.

The sixth complaint is that the deputy prosecutor was guilty of misconduct in his final argument to the jury, prejudicial to the rights of appellant, for

which reason he should have been granted a new trial. The argument complained of referred to statistics along the same line as statistics mentioned in the case of *State v. Stratton,* 170 Wash. 666, 17 P. (2d) 621, which we found not to be prejudicial to the accused in a capital case. The assertions made in the instant case by the deputy prosecutor were no more positive nor outside the record than in that case.

The seventh assignment of error is that the prosecuting attorney was guilty of misconduct in destroying important and material exhibits in the case in such manner as to prevent appellant from bringing a complete record to the supreme court, by reason of which a new trial should be granted. The exhibits referred to in this assignment consist of the two .38-calibre special police revolvers used by Officers Sands and Rehmke and a coat and vest worn by Rehmke at the time of the shooting. Those exhibits were properly identified and proven by the officers, and were in no wise necessary to be presented to this court as exhibits. They were not destroyed, but returned to the officers, who needed them. They were no more necessary than exhibits of intoxicating liquor, which we long ago dispensed with. Had we desired to examine the exhibits mentioned and directed the trial court to have them re-identified and certified, we would have had inherent power to do so, as was held in *O'Donnell v. McCool,* 81 Wash. 452, 142 Pac. 1135. The jury had had the benefit of seeing those exhibits, which were very much like maps and plats, and corroborated the testimony of the officers.

Much of counsel's argument is devoted to questions of fact urging this court to scan the facts carefully and adjudge for ourselves whether they are sufficient to justify the verdict and sentence imposed.

494

This is not a court of first instance, but purely one for the correction of errors in such matters. When the facts are competent and sufficient, it is for the jury to resolve them. The jury did so in this case, after hearing and seeing the witnesses, examining the exhibits and pictures of the scene of the killing, and resolved them to the effect that, not only was appellant guilty of murder in the first degree, with which we thoroughly agree, but that the death penalty should be inflicted.

After a thorough examination of the entire record and consideration of all the errors complained of by present counsel for appellant, we can find nothing justifying reversal of the verdict and special finding of the jury and the judgment of the trial court pronounced thereon. Therefore, they will all stand affirmed.

MILLARD, MAIN, MITCHELL, and GERAGHTY, JJ., concur.

TOLMAN, J. (dissenting)—I concur with the majority in all respects except upon the one question of the misconduct of counsel.

Here, we have an even more aggravated situation than was disclosed in *State v. Stratton*, 170 Wash. 666, 17 P. (2d) 621. The majority has already said: "There simply was no defense to be made as to the crime itself." And the whole issue, in practical effect, was as to whether the jury should, by its verdict, inflict the death penalty.

The deputy prosecutor, well knowing that fact and having, without doubt, fortified himself by reading the *Stratton* case and feeling justified in going just as far as the ruling of that case would permit, proceeded by that sanction of this court to pour out upon the jury a mingled product of fact (not in the evidence), de-

duction and inference which was virtually certain to produce the hanging verdict which he desired. No jury, unless composed of supermen, could withstand such an appeal to their passion and prejudice. What was done in this case demonstrates the unwisdom of the *Stratton* case; and in my judgment, in the interest of justice and fair dealing, the *Stratton* case should be overruled, and the judgment here should be reversed, with directions to grant a new trial.

STEINERT, J. (concurring with the majority)—I concur in the majority opinion. I feel, however, that some answer should be made to what is said in the dissenting opinion.

After referring to the fact that the whole issue in the case was as to whether the jury should, by its verdict, inflict the death penalty, the dissent uses this language:

"The deputy prosecutor, well knowing that fact and having, without doubt, fortified himself by reading the *Stratton* case and feeling justified in going just as far as the ruling of that case would permit, proceeded by that sanction of this court to pour out upon the jury a mingled product of fact (not in the evidence), deduction and inference which was virtually certain to produce the hanging verdict which he desired."

This language is, in my opinion, unjustified and altogether too severe.

The deputy prosecutor could not have "fortified himself by reading the *Stratton* case," for the simple reason that, when the present case was tried, the *Stratton* case had not yet been decided. A reference to the record discloses that the verdict in the case at bar was returned on July 28, 1932, whereas the opinion in the *Stratton* case was not filed until December 23, 1932, practically five months later. Hence, un-

less the prosecutor could foretell in July what this court would decide in December, manifestly, he could not have "fortified himself" thereby.

Nor, in my opinion, is there any justification for saying that the deputy prosecutor proceeded to "pour out a mingled product of fact (not in the evidence), deduction and inference." The misconduct complained of was in the state's closing argument. Counsel for appellant, in his address to the jury, quoted the deputy prosecutor as having said: "Do you think a man of this kind is going to stay in jail very long if you send him up for life?" Counsel for appellant then proceeded to tell the jury that appellant could not get out of the penitentiary, because he would not be able to break out, and that the only other way would be through influence, which he did not have.

There was in evidence a letter written by appellant while in jail to a friend outside, asking the latter to smuggle four hacksaw blades in to him. In answer to the argument of appellant's counsel, the deputy prosecutor said to the jury that, in eight or ten years, the appellant would be pardoned by "some weak-kneed governor," and that the records showed that a life sentence in this state amounted to eight years' service, and elsewhere throughout the United States, seven years; and that appellant, if committed to a life sentence, would either be pardoned in eight years or less, or would be "worming" his way out.

Under the situation as then presented, I do not entertain the view that the deputy prosecutor proceeded to "pour out a mingled product of fact (not in the evidence), deduction and inference." I think that his argument was a legitimate answer to the argument of appellant's counsel.

But, beyond all this, there is the fact that no exception whatever was taken to the remarks of the deputy

prosecutor. Upon a similar situation, we said in *State v. Stratton,* 170 Wash. 666, 17 P. (2d) 621:

"No exception was taken to the argument, nor request made that the court instruct the jury to disregard it, which is necessary to have it reviewed unless it amounted to conduct so flagrant that an instruction would not cure it. *State v. Heaton,* 149 Wash. 452, 271 Pac. 89, quoting the rule laid down in *State v. Meyerkamp,* 82 Wash. 607, 144 Pac. 942. We are satisfied the language of the prosecuting attorney did not constitute misconduct of such flagrance.

"Furthermore, the contentions of the appellant, as we understand, are: (1) That the argument was an undue appeal to passion and prejudice. But an attorney is not confined in his argument to a simple recitation of, or reference to, the testimony, but may draw deductions therefrom, and persuade after the manner of advocacy suggested by the facts and circumstances testified to on the trial.

"(2) That the argument constituted statements of fact not in evidence, that the remarks constituted testimony on the part of the prosecuting attorney, who was not under oath and not subject to cross-examination; and in this connection, it is further claimed that the facts thus testified to by the prosecuting attorney were not true, because, under the statute, there could be no parole of a life prisoner. The suggestion that the law prohibits the parole of a life prisoner may be dismissed in our consideration of the case, because if the jury knew that, they would, of course, pay no attention to it. But suppose they listened, without knowing such to be the law, still there was nothing prejudicial or that constituted reversible error about the argument."

Under the record of the *Stratton* case, I see no unwisdom in the opinion therein, and do not feel that "the interest of justice and fair dealing" requires that that case be overruled. I therefore concur in the majority opinion.

BEALS, C. J. (dissenting)—I am in accord with the opinion of the majority save as to the assignment of error which appellant bases upon the conduct of counsel for the state in the argument to the jury. In the case of *State v. Stratton,* 170 Wash 666, 17 P. (2d) 621, relied upon in this case by the majority as supporting the holding that counsel's argument to the effect that, if appellant were sentenced to life imprisonment, he would probably soon be pardoned, does not constitute reversible error, several authorities (hereinafter referred to) were cited which support the decision. It is to be noted, however, that, in the quotations from the authorities cited set forth in the opinion of the court, such arguments were frowned upon.

In the case of *State v. Junkins,* 147 Iowa 588, 126 N. W. 689, the supreme court of Iowa referred to the argument as "one which would better have been omitted," going on to state that such an argument might in certain cases constitute prejudicial error.

The supreme court of Colorado, in the case of *Wechter v. People,* 33 Colo. 89, 124 Pac. 183, remarks, in passing, that such an argument "had nothing whatever to do with any question involved," the court affirming the death penalty imposed because in its opinion the "argument could not in any way have influenced the jury in returning the verdict they did."

In the case of *Jacobs v. State,* 103 Miss. 622, 60 So. 723, the court stated that an argument advanced by the prosecution in favor of the imposition of the death penalty placed a too harsh and vindictive construction upon the law, the court being of the opinion, however, that it could not be held that the "lurid language of the advocate" contributed to the conviction of the defendant.

Concerning the conduct of the prosecuting attorney

complained of in the *Stratton* case, and after citing the authorities above referred to, this court said:

"The convincing effect of the evidence against the appellant, contributed to substantially by himself, independent of any argument on the part of the prosecuting attorney, clearly justified and manifestly brought about the verdict."

Considering the authorities relied upon by this court in the *Stratton* case and the opinion of this court, it seems to me clear that the holding in that case amounts to no more than that the argument advanced by the prosecuting attorney in favor of the imposition of the death penalty did not constitute reversible error.

In the case at bar, as stated by the majority, it seems clear that the only question which the jury was required to seriously consider was whether or not appellant should be sentenced to life imprisonment or to death. The portion of the argument of counsel for the state of which appellant complains was directed to the vital issue upon which the jury was to pass. Such an argument was absolutely improper. In passing upon the question of the guilt or innocence of one charged with crime, the jury has nothing to do with the punishment which, according to law, must follow a verdict and judgment of guilty. Neither in cases in which the jury is called upon to fix the punishment, as here, should the jury consider possible action of lawfully constituted authority which may at some future date in some manner affect the serving of the sentence which will follow a verdict of guilty. Such an argument as is here complained of is highly inflammatory in its nature. It is a telling argument, carrying a strong appeal and likely to greatly influence at least some of the jurors.

In my opinion, appellant's assignment of error based upon this argument is clearly well taken, and it

should be held that appellant did not have that fair trial which is guaranteed by law to every person charged with crime.

Under the doctrine laid down in the case of *McDonald v. Davey,* 22 Wash. 366, 60 Pac. 1116, the case of *State v. Stratton, supra,* has not yet become *stare decisis.* It seems to me that, in this case, the error, under all the circumstances, is more serious than it was in the former case. The authorities cited in the *Stratton* case criticize such an argument as that now under discussion, and in its opinion this court did not hold that such an argument is proper, but merely held that the record under consideration failed to disclose reversible error. Under the majority opinion in this case, the argument complained of is held to be without prejudice, and prosecutors will be free to indulge in such appeals at will.

Believing as I do that such an argument is basically wrong, and presents to the jury matters which they have no right to consider and which carry a strong appeal to passion and prejudice, I am constrained to dissent from the conclusion reached by the majority.

BLAKE, J., concurs with BEALS, C. J.