[No. 35692. En Banc. September 25, 1962.]

THE STATE OF WASHINGTON, *Respondent*, v. DON ANTHONY WHITE, *Appellant*.*

*Reported in 374 P. (2d) 942.

*James C. Young* and *David A. Weyer*, for appellant.

*Charles O. Carroll, James J. Caplinger, Robert E. Dixon,* and *Victor V. Hoff,* for respondent.

DONWORTH, J.—Appellant was charged, by information, with committing two murders alleged to have been committed at different times and places on the same day (December 24, 1959).

Count I. The first-degree murder of Mrs. Alice Jumper, committed with premeditation and while engaged in committing, in attempting to commit, or in withdrawing from the scene of the commission of, the crimes of rape and robbery.

Count II. The second-degree murder of Willie LeRoy Dixson.

Since appellant was without means to employ an attorney, his present counsel were appointed by the court to represent him. Thereafter, he orally pleaded not guilty to each count and also entered a written plea of not guilty by reason of mental irresponsibility.

Appellant's trial began May 16, 1960, and the case was submitted to the jury for deliberation on May 26. On the following day, the jury returned its verdict of guilty as charged as to each count and, also, a special verdict as to the first count inflicting the death penalty.

Thereafter, appellant's alternative motions for arrest of judgment and for a new trial were heard and denied, and judgment and sentence were entered in accordance with the verdict. Appellant has appealed to this court therefrom, assigning as error eleven rulings of the trial court, which will be considered later in this opinion.

There was little dispute in the evidence as to the commission of the two homicides. The state offered three confessions signed by appellant which related to his activities between the evening of December 23 and the evening of December 24, 1959. In the first of these statements (four pages), given to Sgt. Swindler of the Seattle Police Department on December 28, 1959, appellant described the events preceding and following his assault on Willie Dixson the

evening of December 24. In the second statement (six pages), given to the same detective later on the same date, appellant related the circumstances of the assault on Mrs. Alice Jumper, which took place in the laundry room of the Yesler Terrace housing project in Seattle about 7 a.m. on December 24. Mrs. Jumper died on December 25 as the result of this assault. The third statement (three pages) was given by appellant to Detective Shaneyfelt on January 6, 1960, in order "to help determine the amount of alcohol I had consumed on the night of Dec. 23, and morning Dec. 24, 1959, also the amount of marijuana that I had smoked during this same period of time."

After the state had rested its case, appellant took the stand in his own behalf and testified as to both assaults. However, while on the stand, his memory as to the details of the assault on Mrs. Jumper was not as clear as it was in his second confession. As to the assault on Willie Dixson (which he claimed was made in self-defense), appellant's memory was much clearer. There is no present contention that appellant did not kill both Mrs. Jumper and Willie Dixson.

ASSIGNMENT No. 1:

In appellant's first assignment, he contends that the trial court erred in admitting in evidence, over his objection, two tape recordings of two interviews between him and Sgt. Swindler during which he confessed that he had committed both homicides. Without the knowledge of appellant, the microphone was concealed in a telephone and the machine was located in a desk drawer. During these interviews, the sergeant was supposedly writing out a statement for appellant to sign.

Appellant's ground for objection to the admission of the two tape recordings was that their use in court violated rights guaranteed him by the fifth and fourteenth amendments to the United States Constitution, and that playing them before the jury would prejudice him as to his defenses, particularly on the question of whether the death penalty should be imposed.

A further objection to these tape recordings was that they were not properly identified and authenticated in accordance with the rules laid down by this court in *State v. Williams*, 49 Wn. (2d) 354, 301 P. (2d) 769 (1956). We have considered appellant's argument in support of the latter objection and are of the opinion that the admission and use of the recordings by the trial court was in accordance with the rules laid down in the *Williams* case and cases cited therein.

■ Nor was appellant deprived of any constitutional rights because he was unaware of the presence of the recording device during the interview. His contention in this respect is that he had no choice between speaking orally to the detective and "speaking for the purpose of having what he said recorded as a confession." This argument is based on the premise that, in *Mapp v. Ohio*, 367 U. S. 643, 6 L. Ed. (2d) 1081, 81 S. Ct. 1684 (1961), it was held that both the fourth and fifth amendments to the United States Constitution are applicable to the states under the Fourteenth Amendment. We do not so read the majority opinion. Only the Fourth Amendment was held to be applicable to the states, and no unreasonable search and seizure is involved in the case at bar. Even if it be assumed that appellant was by deception compelled to give evidence against himself, the Fifth Amendment affords him no basis for relief, because it has no application to state action. *Hurtado v. California*, 110 U. S. 516, 28 L. Ed. 232, 4 S. Ct. 111 (1884); *Adamson v. California*, 332 U. S. 46, 91 L. Ed. 1903, 67 S. Ct. 1672, 171 A. L. R. 1223 (1947); *In re Huffman v. Smith*, 34 Wn. (2d) 914, 210 P. (2d) 805 (1949). No federal question is presented here. (Note that in a similar case in a federal court it was held that there was no violation of a constitutional right. *Todisco v. United States*, 298 F. (2d) 208 (1961), cert. den. Feb. 19, 1962, 368 U. S. 989, 7 L. Ed. (2d) 527, 82 S. Ct. 602.)

■ In the present case, the trial court did not abuse its discretion in admitting the tape recordings, because they tended to show matters which the written confessions

could not show, such as the voluntariness of his statements (or lack thereof) and his general attitude toward the two homicides. In such situations, the trial court may exercise its discretion in admitting or excluding evidence. *State v. Wilson*, 38 Wn. (2d) 593, 231 P. (2d) 288 (1951).

We find no merit in appellant's first assignment of error.

ASSIGNMENT No. 2:

The basis for appellant's second assignment of error is the trial court's refusal to strike or reduce Count I to second-degree murder on the ground that the state's evidence failed to show premeditation or a felony murder.

Appellant's position regarding his challenge and motions made at the trial is stated in his brief as follows:

"At the close of the state's case the appellant challenged the sufficiency of the evidence as to the count involving First Degree Murder. The challenge was made both as to premeditated design and the 'Felony-Murder' Doctrine. The appellant had presented to the trial court a memorandum pertaining to the Felony Murder Doctrine. The court denied the challenge and motion. Appellant then presented his evidence, a large portion of which consisted of psychiatric testimony. At the close of appellant's case and state's rebuttal, appellant again moved to have the question of premeditation and felony murder removed from Count 1 thereby removing the count of murder in the First Degree. The court denied appellant's motion as to premeditation and the felony murder doctrine.

"In order to establish a charge of murder in the First Degree based upon premeditation, proof of deliberation or premeditation is necessary. *State v. Davis*, 6 Wn. (2d) 696, 706, 108 P. (2d) 641, (1940). The fact of killing alone raises no presumption of premeditation or deliberation. *State v. Gaines*, 144 Wash. 446, 258 Pac. 508, 512 (1927). In the case at bar the state on its charge of Murder in the First Degree showed a beating from which Alice Jumper died. It was a beating by fists, no instrument being used. In addition, the state failed to show any prior relationship or acquaintance or any other evidence from which a jury could infer deliberation or premeditation. The beating occurred in a community-type washroom when appellant walked in to use the toilet. Nothing else was shown as a basis for the beating, therefore, the evidence failed to

establish a prima facie case of premeditation or deliberation."

Appellant further contends that the testimony of the psychiatrists produced by the defense established that he was incapable of formulating an intent to effect the death of Mrs. Jumper. Consistent with the contention, he excepted to the court's instructions on premeditation.

 The state's evidence bearing on the issue of premeditation and also on the issue of felony murder included appellant's signed confession of December 28, 1959, in which he described the beating of Mrs. Jumper (whom he had never seen before) as follows:

". . . I believe it was about 3:00 a.m. when I arrived back in the vicinity of 12th Ave. & Jackson St. I then walked around in the vicinity of the Yesler Housing Project for two or three hours. Finally, I passed by one of the Yesler Housing Project Laundry Rooms which is located just off Fir St. I used to live in the next unit from where the laundry room is located. As I was passing the laundry room, I looked in and noticed a white woman doing something with some clothes. She was either folding or hanging up clothes. I decided to go into the laundry room to use the head. The woman had her back to me as I entered the door and was standing over by one of the dryers. I walked past the woman into the back and tried the door to the head but it was locked. I then turned around and started back out. When I got even with the woman I just punched her with my fist knocking off her glasses and knocking her to the floor. The glasses slid across the floor to a spot near the door. The woman wasn't knocked unconscious by my blow and she grabbed me around the legs and by one hand. I then lifted her up off the floor real fast and fairly high so that her legs flew up in the air. I then dropped her and her head hit the cement floor before the rest of her body. The woman still wasn't unconscious and was trying to get up. I then picked her up and took her back into a small storage room. I laid her down on the cement floor on her back with her head toward the door. She still wasn't unconscious so I hit her three or four times with my fists in her face. She didn't move anymore then except she sort of raised her arm and I removed her watch and ring. I then started to leave but then came back to where she was lying. I had earlier torn off her panties and had ripped her dress so

when I got back into the room I had sexual intercourse with her. I had intercourse with her for about a minute but did not reach a climax. I would describe this woman as being about 45 or 46 yrs. of age with grayish black hair and with a stocky build. I don't remember what kind of clothes she was wearing. As I walked back out of the storage room, I noticed the woman's glasses laying near the door. I picked them up and put them in a laundry tub nearby. I then started to leave but about that time another white woman and a little girl were at the door to the laundry room. I opened the door for them and then stepped back and started fooling around with some clothes that were folded across a laundry tub. After a few minutes, the woman and the little girl left. Just after they left, a young colored woman came into the laundry room with a laundry bag full of clothes. She started using the washing machine and we started talking with each other. I told her that I was waiting to help a friend of mine's wife do the washing. We talked together for about an hour about various things, I don't remember what we were talking about. At one time she left the laundry room to get me some matches for my cigarette. A short time later, she and I left the laundry room about the same time. During all this time I had been wearing the Housing Authority Badge. I walked south from the laundry room toward Yesler Way and walked to the California Bar located at 2nd Ave. and Washington St. Sometime during this walk I removed the Housing Badge and put it in my pocket. I drank wine at the California Bar for twenty or thirty minutes and then went to the Pioneer Loan office where I pawned the woman's watch and ring which I had taken earlier. I received a little over nine dollars for the two items. I used the name McCory Watson when I signed the pawn book because the pawnbroker knew me by that name. After I pawned the watch and ring, I went over to the B & R cafe where I had a couple of mixed drinks. I then started walking around and finally ended up at home about noon. On the way home at 24th Ave. and Ea. Union St. I threw the Housing Badge between a garage and cleaners. . . ."

At the close of the state's case the trial court ruled that there was sufficient evidence to take the case to the jury on both the issues of premeditation and felony murder.

When appellant took the stand in his own defense, he testified on direct examination, in part, as follows:

"Q. Well, I want you to testify as to what you actually recall. What is the next thing, Don? A. The other laundry. Q. What other laundry? A. The one at Yesler Terrace. Q. And do you know that laundry from somewhere else? A. I used to live right in front of it. Q. Is this the laundry where your mother did her washing? A. Yes. Q. Now, when you lived at the Terrace, Don, do you recall being in this laundry? A. Yes. Q. On many or few occasions? A. We used to hide—play games in it. Q. Do you recall the lavatory facility in this laundry? A. Yes. Q. At the time you lived there, was this facility open. A. Yes. Q. Do you recall whether they were ever locked or not? A. No. They can only be locked from the inside. Q. Now, what time of day—you say you recall the laundry at the Terrace—do you recall what time it was? A. No. Q. What do you recall about that incident? A. I walked—I remember walking in the door. Q. What did you observe as you walked in the door? A. Nothing. Q. Where did you go? A. To the back. Q. Now, I want you to testify from this point on from what you remember at the time. A. I remember going in the door, and I walked to the back, and the door wouldn't open, and I came back to the front, or I turned around and there was a bang! Q. There was a what? A. A bang! Q. And then what do you remember? A. I just remember throwing a punch. Q. Throwing a punch? A. Yes. Q. Now, then what do you remember? A. This lady flying in the air. Q. Then what do you remember? What did you remember next? I'm asking you now what you remember at that time or recalling— A. Trying to put something underneath her head. Q. And where was that? A. I think it was in the back. Q. Would you turn around, Don, and look at Defendant's Exhibit No. 1. Can you state where this was that you tried to put something under her head? A. The washing machine storage room. Q. On the left or the right? A. the right. Q. Do you remember that? A. I just remember putting something under her head. Q. Do you remember what this was? A. I'm not sure. Q. Do you remember why you put it under her head? A. I left and I went back to put it under her head. I thought she was hurt. Q. What do you mean? You said to me that the next thing you remembered was putting something under her head, and then you said you left and then you came back and put something under her head? A. I remember hitting her, I think. I remember throwing a punch at her, and I remember her going through the air, but she was still talking, and I don't know— Q. Now,

after you put something under her head, what do you recall then? A. Talking to another lady. . . . Q. Now, as a result—well, I will ask you this, Don, you heard the tapes that were played by the police, did you not? A. Yes. Q. And under those tapes you gave a much fuller statement than you have just given? Isn't that correct? A. Yes. Q. Can you explain that? A. Yes. Q. Would you do so? A. When I was arrested and they told me, before,—before I was arrested, I read in the papers that I had—that there was some—they bothered two people; one—not the names, because I didn't know them, but the places. Q. Did you read the description of these things in the papers then? A. Yes. Q. When? A. It was the morning I took a bath that morning, and I was reading the paper, and I was arrested Saturday. Q. Saturday? A. Yes. Q. Christmas was on the 25th or Friday, was it not? A. Yes. Q. Do you mean on the 26th you were arrested? A. Yes. . . . Q. Now, Don, if you will try to speak up so we can all hear. When you were last on the stand, you were talking about some clothing that I believe you said you put under her head. Is that your testimony? I want you to testify from your memory of this instance. A. I don't know how to say it, but I am not sure of what I did while I was there. I am not certain. By reading newspapers, and what I was told, and what I have been listening to, I have—it fits; it makes logical sense. Q. In other words, you can't—you don't know whether it is your memory from recollection or refreshing your recollection or from what you remember of the incident? A. I have a bad sense of segregating the time. Q. Well, tell us from your total memory what happened as best you can from the time that you went back to the lavatory door and found it locked. A. I remember turning around by the door and walking back to the front, and at the time I heard a bang and a screech. Q. What was your feeling at that time, do you recall? A. Just a headache. Q. What? A. A headache. Q. After you heard the bang, what was your reaction? A. It wasn't the bang as much as like a scream, like a screech—like brakes. Q. All right, you heard this, did you? A. Yes, like a scream. Q. And then what happened, to the best of your memory? A. I remember the punch. Q. And then what happened? A. I remember her going through the air. Q. You remember what? A. Her going through the air. Q. Her going through the air, is that what you said. A. Yes. Q. Then what do you remember? A. At some stage I am folding towels, but I don't remember when.

Q. Then what do you remember? A. Putting—I remember going in the bathroom. Q. And what did you do with those towels, if you remember? A. I put them somewhere. I don't know where I put them. Q. Didn't you just testify that you put them under her head? A. I thought maybe— I am not sure where I put them. I put them somewhere near her, I know. Q. Then what did you do? A. I left, went back to the front room. Q. Do you remember what you did out there? A. I think I set on a table. Q. And do you remember where the table was? A. It was in the corner. Q. What corner? Can you point to the corner with your hand? A. By the driers on the righthand side. Q. The corner by the driers on the righthand side? A. Yes. Q. And you are referring to Exhibit 1, State's Exhibit 1? A. Yes. Q. Then what do you recall next? A. Talking to a—the woman. Q. And that was Mrs. Ricks? A. Yes. . . . Q. Do you know where you went? A. I think I went home. Q. Now, I want you to try and recall as best you can from your total memory, where do you think you went? A. Home. Q. Now, you heard the police tapes, did you not? A. Yes. Q. And did you hear the question of the police officer when he asked you what you did to her? A. Yes. Q. And you said you did things? A. Yes. Q. And he said, 'You mean you raped her?' And you said, 'Yes.' Do you remember that testimony? A. Yes. Q. Do you recall this happening? A. Not raping her, no. Q. Do you know whether you did or didn't? A. No. Q. Do you know why you told the police this if you don't know? A. Yes. Q. Why? A. The papers already said that I did it. I just said, 'Okay.' The papers said 'Brutally beaten, with criminal assault'. I said 'Okay.' I never said no to anything. Q. What do you mean by 'you never said no to anything'? Why didn't you? A. I didn't care. Q. Do you also recall on the tapes it was stated you had taken her ring and watch; do you recall that? A. I don't remember taking it. Q. Do you remember having it? A. Yes. Q. Do you remember what you did with it? A. Yes. Q. What did you do with it? A. I took it to the pawn shop. Q. When? A. I don't remember which day. Q. What pawn shop did you go to? A. The same one my brother-in-law's watch was in. Q. Do you recall which one? A. No. Q. Do you recall how much money you got for them? A. No. Q. Was it $10? A. Yes. Q. Why do you say 'yes'? A. That's what the man said, I got $10. Q. What man said that? A. The guy that was here. Q. You mean the pawn-shop man? A. Yes. Q. But from your own memory is what we are trying to get your

answers, Don. Will you try and answer from your own memory rather than what you heard somebody else say? A. I don't remember getting money from him at all. I remember talking to him, but I thought it was about my brother-in-law's watch, and I don't remember giving him the woman's watch; but I said I did. Q. But you remember having the woman's watch; is that true? A. Yes. Q. Now, what is the next thing you remember? You said you went home after you left the laundry; do you remember that? A. I said I think I went home. Q. Well, now, I want you to answer what you remember. A. I don't know where I went after that. Q. What is the next thing you remember? A. I was going home then—or I had been home—I was in my neighborhood, and I was going in the back door of my house from the corner."

Appellant's testimony did not deny the killing of Mrs. Jumper nor the robbery or rape, but consisted of statements that, at the time of the trial, he was unable to recall clearly the details of these events.

There was sufficient evidence both at the close of the state's case and at the end of the trial to take both these issues (premeditation and felony murder) to the jury.

■ *State v. Davis*, 6 Wn. (2d) 696, 108 P. (2d) 641 (1940), cited by appellant regarding his claimed lack of a sufficient showing of premeditation, contains the following statement of the applicable law:

"This court has held that the premeditation required in order to support a conviction of the crime of murder in the first degree may involve no more than a moment in point of time. . . ."

■ Concerning the felony murder issue, appellant calls our attention to *State v. Diebold*, 152 Wash. 68, 277 Pac. 394 (1929), in which it is stated that the felony committed or attempted must have an intimate relation and close connection with the homicide and must not be separate, distinct, and independent of it. However, the fact that here the homicide preceded by a few seconds or minutes the rape and robbery does not isolate it from the other felonious acts specified in Count I.

We hold that, under the evidence in this case, the two

issues above discussed were for the jury to decide, and that the court's instructions submitting them to the jury were not erroneous.

ASSIGNMENT No. 3:

Appellant called as an expert witness Dr. G. Charles Sutch, a psychiatrist, who had examined him while he was under the influence of sodium amatol and desoxyn (a so-called truth serum). Appellant was given this drug to assist the doctor in making his diagnosis.

It is contended that the trial court erred in two respects:

1. In refusing, on the state's objection, to permit Dr. Sutch to testify as to any statements made by appellant while under the influence of the drug or to describe this interview with him.

2. In refusing to admit in evidence a tape recording of the interview (which appellant claims he requested the court to have played in the presence of the jury).

Dr. Sutch testified as to his diagnosis of appellant's mental condition and was permitted to relate the kind of drugs administered, the purpose thereof, and their effect upon appellant. The witness fully explained the basis for his diagnosis. The diagnosis was favorable to appellant, and there is no contention that the statements should have been admitted for the purpose of cross-examination and contradiction.

Appellant contends that the rejected testimony and the tape recording were not offered to prove the truth of statements made by him to the psychiatrist while he was under the influence of the drugs, but to enable the jury to better understand the basis of the psychiatrist's opinion that appellant had a psychotic reaction which was chronic, recurrent, and episodic. In other words, the statements were offered simply to lend support to the doctor's conclusions.

In support of this assignment, appellant relies principally on *People v. Cartier*, 51 Cal. (2d) 590, 335 P. (2d) 114 (1959), in which the trial court was reversed because of its refusal to admit such evidence under similar circumstances

in a murder case. Appellant, in his brief, quotes the following portion of that decision:

" 'In the present case the testimony offered was the expert opinion of the psychiatrist that the defendant was insane at the time of the commission of the alleged offense. The statements made to the psychiatrist by defendant while under the influence of the drug were not offered for the purpose of proving the truth of the matter asserted therein. Hence, under the foregoing rule, it was error for the trial judge to exclude the proffered evidence.' "

It is argued that the words "under the foregoing rule" referred to the case of *People v. Jones,* 42 Cal. (2d) 219, 266 P. (2d) 38 (1954).

The state, on the other hand, argues that the *Jones* case held only that the psychiatrist could give his expert analysis of the defendant's answers to his questions while under the influence of such drugs. Hence "the foregoing rule" referred to in the quotation from the *Cartier* case did not include testimony regarding what the defendant said and did during the psychiatrist's examination of him.

The state cites in support of its position the earlier California case of *People v. McNichol,* 100 Cal. App. (2d) 554, 224 P. (2d) 21 (1950), in which the defendant offered to prove, by a psychologist, statements made by the defendant while under the influence of sodium pentathol. In answer to the defendant's contention that the trial court erred in excluding this proffered testimony, the district court of appeal said:

"As for appellant's argument that what was said by appellant while under the influence of sodium pentathol should have been allowed to show the *facts* upon which Mr. Singer based his opinions, the testimony of that witness was given in response to questions regarding a hypothetical man in the condition of this defendant; and his conclusions were that such man would not have had a conscious intent to defraud. How any statements made by defendant during the imposed hypnotic state would have served to show *facts* upon which he based his replies to the hypothetical questions, or any facts at all, is not made apparent. Evidence was admitted showing appellant's condition, and the questions were apparently addressed to appellant's intent

in drawing and uttering the checks, which defendant did not contend or attempt to show he had not written and passed. Defendant's intent was the only matter open to question, and Mr. Singer testified on that subject in response to the questions submitted to him. . . ."

The most recent decision of the Supreme Court of California bearing upon the question before us is *People v. Busch*, 16 Cal. Rptr. 898, 366 P. (2d) 314 (1961), in which a medical doctor who had examined the defendant in a first-degree murder case, had used (in addition to the usual methods) hypnosis as an analytical tool. The trial court had determined that the witness was not competent to testify as to the defendant's frame of mind at the times he committed the several killings, based on information obtained by him from the defendant while the latter was hypnotized.

The California Supreme Court, after quoting from the *Jones* case, in affirming the trial court's ruling, said:

". . . On the other hand the latest expression of this court as to the admissibility of expert opinion evidence formulated through the use of a lie detector is as follows: 'Lie detector tests do not as yet have enough reliability to justify the admission of expert testimony based on their results. (Citations.)' (People v. Carter, 48 Cal. 2d 737, 752, 312 P. 2d 665, 674.)

"In the instant case the witness conceded that this was his initial appearance in the role of an expert in a criminal case on the subject matter of an accused's state of mind; that he was not a psychiatrist and had engaged in the practice of medicine as a general practitioner until shortly before his appearance in the case at bar as an expert specializing in hypnosis. In laying a foundation for the introduction of opinion evidence of the state of mind of a defendant based upon the use of a technique not theretofore recognized by the courts as sufficiently reliable to form the basis for such an opinion, at the very least, some showing of its successful use in the examination of others than the defendant for the same purpose, either by the witness or by other experts in the field, would appear to be required. We are persuaded that under the circumstances herein narrated the trial judge did not act unreasonably in his determination that a proper foundation was not

established as to the reliability of an analytical tool still seeking recognition in the field of psychiatry, or as to the qualifications of this particular witness to give an opinion on the state of mind of the accused on the occasion of the commission of the homicides herein. It must be remembered, ' * * * the general rule is that the trial court, in passing upon the qualification of a witness offered as an expert, has wide discretion, and an appellate court will not disturb its ruling in the absence of a manifest abuse of such discretion.' . . ."

While we recognize that hypnosis and "truth sera" are two entirely different methods of psychiatric examination, we are not persuaded that the California rule would require the admission of the evidence rejected by the trial court in this case.

The general subject of the reliability of lie detector tests is discussed at length in *State v. Sinnott*, 24 N. J. 408, 132 A. (2d) 298 (1957), in which the New Jersey Supreme Court declined to follow the California decision in the *Jones* case, saying:

"The *Jones* case has been criticized by *Falknor* and *Steffen*, 'Evidence of Character: From the "Crucible of the Community" to the "Couch of the Psychiatrist,"' 102 U. of Pa. L. R. 980 (1954), and praised by *Curran*, 'Expert Psychiatric Evidence of Personality Traits,' 103 U. of Pa. L. R. 999 (1955). Both articles contain reservations concerning the dependability of the offer in the *Jones* case, especially on the ground that there were only two consultations with the defendant, but Curran maintains that this objection should go to weight rather than to admissibility. Interestingly enough, Curran quotes a letter from Dr. Solomon, the psychiatrist used by Jones, to the effect that he had great difficulty in dealing with questions as to 'incapability.' Dr. Solomon writes: ' * * * it is my opinion that anyone is capable of anything * * *'

"As laymen in the field of psychiatry, we are dubious as to the validity of the offer in this case and question the sufficiency of the foundation laid below. We have already stressed the authorities reporting that the administration of 'truth serum' does not necessarily produce the truth. Dession, Freedman, *et al.*,[1] emphasize over and over again

[1] 62 Yale L. Jour. 315.

that use of drugs is only valuable as an 'auxiliary procedure in a thorough diagnostic examination.' Apparently, however, they and others regard it as unimportant for present purposes that the drugs do not always conduce representations consonant with empirical fact. For diagnosis of personality traits and tendencies it is immaterial, in their opinion, whether the subject is falsifying, either of his own will or in accordance with suggestion. The drug is utilized not primarily to elicit truth but to enable the psychiatrist to more quickly probe the subject's subconscious mind."

It is clear that there is no guarantee of truth simply because a statement was made while under the influence of drugs, for

". . . experimental and clinical findings indicate that only individuals who have conscious and unconscious reasons for doing so are inclined to confess and yield to interrogation under drug influence. On the other hand, some are able to withhold information and some, especially character neurotics, are able to lie. Others are so suggestible they will describe, in response to suggestive questioning, behavior which never in fact occurred. . . ." Dession, *et al.*, "Drug Induced Revelation and Criminal Investigation," 62 Yale L. Jour. 315, 319 (1953).

▉ A layman would find it extremely difficult, if not impossible, to make an accurate evaluation of the testimony which was offered. On the other hand, the possibility that a jury might be confused or misled by such evidence is quite real. Therefore, the trial court could have concluded that whatever dubious value such testimony might have would be more than outweighed by the danger of its misinterpretation and misuse by the jury. It would have been quite proper for the trial court, in the exercise of its sound discretion, to exclude the proffered evidence on the basis of the foregoing reasoning.

We hold that the trial court in this case did not abuse its discretion in limiting the testimony of Dr. Sutch to explaining the use of the drugs by him and to giving his opinion as to appellant's mental condition based on his own examination of him while under their influence. Nor was

there any abuse of discretion in refusing to admit the tape recording (assuming that it was definitely offered in evidence).

We have discussed this third assignment at some length because the question raised is one of first impression in this state. In our opinion, it is without merit.

ASSIGNMENT No. 4:

In his fourth assignment of error, appellant contends that the trial court erred in overruling his challenges for cause of several prospective jurors. One prospective juror said that:

" . . . I have definite convictions about the relationship between mental irresponsibility and first degree murder, and it would be awful hard for me in this case, unless this man was entirely crazy, to give a fair decision. . . ."

Another indicated that the defendant would have to produce more convincing evidence on mental responsibility than on other elements of the case, in order to convince him.

Both of these prospective jurors, as well as all of the others involved in this assignment of error, were thereafter thoroughly questioned by the court and by both counsel. Despite their previously formed opinions, all of these jurors indicated that they would disregard their previous feelings and decide each question on the evidence presented at the trial, and on the court's instructions as to the law.

A juror is not disqualified because he holds certain preconceived ideas, provided he can put these notions aside and decide the case on the basis of the evidence given at the trial and the law as given him by the court. See *State v. Bird*, 31 Wn. (2d) 777, 198 P. (2d) 978 (1948); *State v. Croney*, 31 Wash. 122, 71 Pac. 783 (1903); and *State v. Gile*, 8 Wash. 12, 35 Pac. 417 (1894).

A thorough examination of the entire voire dire examination of each of the challenged prospective jurors shows

that the trial court did not abuse its discretion in over-ruling the challenges.

The record does not support this fourth assignment of error.

Assignment No. 5:

In this assignment appellant challenges the constitutionality of the following portion of RCW 9.48.030 providing for the imposition of the death penalty in first-degree murder cases:

"Murder in the first degree shall be punishable by imprisonment in the state penitentiary for life, unless the jury shall find that the punishment shall be death; and in every trial for murder in the first degree, the jury shall, if it find the defendant guilty, also find a special verdict as to whether or not the death penalty shall be inflicted; and if such special verdict is in the affirmative, the penalty shall be death, otherwise, it shall be as herein provided. . . ."

A 1948 survey of the various state laws pertaining to the jury's role in determining the punishment for first-degree murder may be found in the appendix to *Andres v. United States*, 333 U. S. 740, 92 L. Ed. 1055, 68 S. Ct. 880 (1948). At that time, although a majority of jurisdictions which retained the death penalty placed its imposition at the discretion of the jury, only New Hampshire and Washington phrased their statutes so that the prescribed penalty for murder in the first degree was life imprisonment, with the jury having the discretionary power to *increase* the penalty to death.

Appellant asserts that there is no prejudice to a defendant when a jury recommends mercy, without the application of particular standards, because there the normal penalty is thereby reduced. However, appellant contends, when the jury is given the power to increase the penalty—to impose a punishment of greater severity than the normal punishment—then the jury is exercising a judicial, rather than a discretionary, function, and the exercise of this function must be based on definite criteria.

Appellant, in his reply brief, said:

". . . As we now see it, a jury, in inflicting a death penalty, may do so because of a person's race, their religion,

their economic circumstances, their attitude and demeanor on the witness stand, their prior history, even the color of their hair, or their stature. It is clear that any time a jury bases such a decision on any of these factors, alone or in combination, it denies equal protection of the laws and due process of law.

"In summary then, the contentions of appellant are two. The statute in question prescribes different punishments or different degrees of punishment for the same act committed under the same circumstances by the same class of person and is therefore in violation of the equal protection clause of the 14th Amendment of the United States Constitution. Secondly, even if a jury could, under the statute, return a verdict of death, it is violation of the due process and equal protection clause of the 14th Amendment of the United States Constitution for state statute to allow them to do so without proper standards, without forbidding them to consider certain factors, or in the least, to instruct them as to basic considerations in inflicting such a penalty."

██ We think that appellant's point is not well taken. If the difference in wording between our statute and those of most other jurisdictions has any practical effect on the rights of first-degree murder defendants in this state, that effect is probably favorable to such a defendant, because jury members are much more likely to be cautious about imposing the death penalty when that penalty is regarded as extraordinary, than when it is the "standard penalty" for first-degree murder.

Furthermore, no decisions of this court or of other courts of last resort which are directly in point have been cited in support of appellant's contention that this statute is invalid. The case nearest to being authority is *State v. Riley*, 126 Wash. 256, 218 Pac. 238 (1923), in which this court upheld the right of the state to secure jurors who were not opposed to inflicting the death penalty in a proper case. See, also, *State v. Mahoney*, 120 Wash. 633, 208 Pac. 37 (1922), where the right of the state to challenge, for cause, was upheld with respect to prospective jurors who had conscientious scruples against imposing the death penalty.

Since 1919, when the above-quoted statute was enacted (a period of more than 40 years) no person condemned

to die by the verdict of a jury has ever before challenged the validity of the procedure prescribed therein. This fact is, of course, not determinative as to the lack of merit in the present contention that this statute is invalid, but when there is, as here, a complete failure to refer to any decision in the United States in which such challenge has been made, we do not hesitate to hold that appellant has failed to overcome the presumption of constitutionality of the above-quoted statute. The burden of convincing a court of its invalidity rests upon the person asserting such invalidity.

In the case at bar, the trial court instructed the jury as to the imposition of the death penalty as follows:

"You are instructed that in every trial for murder in the first degree, the jury shall, if it finds the defendant guilty, also find a special verdict as to whether or not the death penalty shall be inflicted, and if such special verdict is in the affirmative, the penalty shall be death."

Under *Winston v. United States*, 172 U. S. 303, 43 L. Ed. 456, 19 S. Ct. 212 (1899), the instruction given was adequate to apprise the jury of its duty to determine whether or not the death penalty shall be inflicted. No standards are required by our statute or the constitution.

ASSIGNMENT No. 6:

This assignment may be briefly disposed of. Appellant urges us to review the action of the jury in inflicting the death penalty and to hold that the jury abused its discretion under the statute quoted above. This court has no authority by statute or otherwise to review the jury's action either in rendering its verdict of "guilty" as charged or "not guilty," or in rendering its special verdict (after a general verdict of guilty) as to whether the death penalty shall be inflicted.

We cannot substitute our judgment for that of the jury in either instance, even if, had we been jurors, we might have rendered a different verdict. The constitution (Art. 1, § 21) states that the right of trial by jury shall remain inviolate. We decline to usurp functions which the constitution has vested in the jury.

No question is presented by this assignment which this court may decide. *People v. Valenzuela*, 7 Cal. (2d) 650, 62 P. (2d) 142 (1936); *State v. Lantzer*, 55 Wyo. 230, 99 P. (2d) 73 (1940).

The majority opinion in *State v. Bradley*, 175 Wash. 481, 27 P. (2d) 737 (1933) (a first-degree murder case in which the death penalty was inflicted) supports our conclusion that this court cannot pass upon matters which are exclusively within the province of the jury. It was stated in that opinion:

"Much of counsel's argument is devoted to questions of fact urging this court to scan the facts carefully and adjudge for ourselves whether they are sufficient to justify the verdict and sentence imposed. This is not a court of first instance, but purely one for the correction of errors in such matters. When the facts are competent and sufficient, it is for the jury to resolve them. The jury did so in this case, after hearing and seeing the witnesses, examining the exhibits and pictures of the scene of the killing, and resolved them to the effect that, not only was appellant guilty of murder in the first degree, with which we thoroughly agree, but that the death penalty should be inflicted.

"After a thorough examination of the entire record and consideration of all the errors complained of by present counsel for appellant, we can find nothing justifying reversal of the verdict and special finding of the jury and the judgment of the trial court pronounced thereon. Therefore, they will all stand affirmed."

ASSIGNMENT No. 7:

Appellant contends that the trial court erred in failing to give his proposed instruction No. 23, which would have instructed the jury as follows:

"If you find that the defendant is not guilty by reason of mental irresponsibility, it is not for you to determine what is to be done with him. That responsibility rests with the Department of Institutions not with the jury."

After the verdict was rendered, and in support of the motion for new trial, appellant's counsel filed their own affidavit, stating the result of their post-trial interviews with seven members of the jury. The substance of this affidavit purported to show that the imposition of the death

penalty resulted primarily because a majority of the jury felt that they could not trust the authorities to keep appellant institutionalized until he was safe to be at large and thus protect society.

Appellant's counsel state their position in their brief as follows:

"In this case, in order to bring all the possible facts before the jury, it was necessary to bring before the court the appellant's whole life history which included the records from the many state and private institutions where he had been placed. We recognized at the time, without such an instruction, this might be somewhat dangerous inasmuch as these records were replete with the failure of the authorities in charge to maintain the appellant in these institutions until he was safe to be at large and thereby fully protect society. . . ."

 Appellant cites one of the dissenting opinions in *State v. Bradley*, 175 Wash. 481, 27 P. (2d) 737 (1933), which involved a first-degree murder conviction where the death penalty was imposed. In that case, however, no plea of not guilty by reason of mental irresponsibility was involved. Where such a plea has been made under the provisions of RCW 10.76.020, RCW 10.76.030 requires the jury, if it acquits the defendant for that reason, to return a special verdict stating that the acquittal is because of insanity. In that event, the jury is required to answer these two questions:

" . . . (3) whether the insanity or mental irresponsibility continues and exists at the time of the trial, and (4) whether, if such condition of insanity or mental irresponsibility does not exist at the time of the trial, there is such likelihood of a relapse or recurrence of the insane or mental irresponsible condition, that the defendant is not a safe person to be at large. . . ." RCW 10.76.030.

In the present case, the court so instructed the jury in four instructions and submitted forms for the return of special verdicts in accordance with the statute.

The requested instruction does not correctly state the law applicable to this case, and appellant had no right to assume, in presenting his evidence in support of his plea

of mental irresponsibility, that it would be given. The trial court did not err in failing to give proposed instruction No. 23.

ASSIGNMENT No. 8:

After appellant had concluded his defense, the state called as a rebuttal witness Dr. Garre, a psychiatrist. He had never examined appellant personally but had familiarized himself with various official reports concerning appellant.

Dr. Garre, on direct examination, was asked a long hypothetical question relating to the two homicides referred to in the evidence. The witness was asked if he had an opinion concerning the mental condition of the person referred to in the hypothetical question. He answered in the affirmative, and he was then asked what his opinion was. The following then took place:

"A. My opinion is that this man, based on my review of these exhibits, is basically, to be classified, in my opinion, as a sociopathic individual which is almost identical with the older term of psychopathic individual. We can well understand the circumstances which made him form into a pattern which he shows, but at the same time, although, of course, he was at that time under the influence of wine and marijuana, which decreased his own judgment and inhibitions, but nevertheless in the terms of the law, he has to be— MR. WEYER: If the court please, I do not want —I object to his testifying in terms of the law. THE COURT: I think he can complete his answer. If you have a motion when the answer is complete, I think that those terms have been used by previous witnesses, and I think he may continue with his answer—if you have a motion at the end of the answer, I will entertain it. MR. WEYER: May the record show our exception to the court's ruling? THE COURT: Yes. Q. Would you proceed, Doctor? A. Thank you. So, it is my opinion in terms of the law, which clearly defines that the most important part is the knowledge whether the individual at the time of the commitment of the actions is able to differentiate between right and wrong, my answer is that he was in a position to distinguish between right and wrong, and therefore, in the terms of the law, is responsible for his action. But I elaborate once more that if his record is well understood, and if this individual is well understood, we can understand what finally developed the pattern which basically has to be classified

as sociopathic. All the other psychiatric terms which have been used are, of course, true to a high degree. A labelling of an individual is never, first of all, almost never a clear-cut case because we all show features which blend into one another, but basically still I feel he is a sociopathic individual who is responsible before the law. Q. What is your definition of a sociopathic individual? MR. WEYER: Same objection, Your Honor, and we ask that the last statement be stricken as he is testifying as to what the law is in his opinion, and if he's guilty of the law. That is the job of the jury. THE COURT: It is not clear to me that he is attempting to testify as to the law. Would you like to elaborate on that part, whether he is referring to the law —well, with what intent he refers to the law? Q. Are you familiar with what the legal test of sanity is, Doctor? A. I am familiar with the McNaghten rules. Q. And that is what? A. That an individual at the time of the commitment of the act can distinguish between right and wrong, he knows the type of action which he commits. Q. And then in this— MR. WEYER: Same objection, Your Honor, and we ask that it be stricken. THE COURT: I will reserve ruling. Complete your examination. Q. Would you define sociopath please? MR. WEYER: If the court please— THE COURT: Just a moment. Is that all the questions that you planned to ask on that point? MR. CAPLINGER: I have several questions, your Honor. THE COURT:—on the sense in which he was using the language with reference to legal tests? Q. Doctor,— THE COURT: You see the point is, Mr. Caplinger, the objection is that the witness has been telling the jury what the law is. Now, of course, if that were clearly so, the objection should be sustained. I am not satisfied that that is the intent that the witness had in mind, and I think there is a distinction here that must be developed somehow or other. I think that as the State's witness, you're entitled to develop it, and Mr. Weyer, if he desires to cross-examine on that point, may do so, and if the court feels still further elucidation should be made, the court will ask questions. But the point is, we don't want the jury to misunderstand this testimony in view of some of the language used. There is a possibility. Now, you will understand, of course, that the function of the jury is to decide the facts; the function of experts is to tell about the matters within the field of their expert training; the function of the court is to tell the jury what the law is. When we come to different tests, and this question of mental irresponsibility, there may be apparent confusion of

ideas in what tests are used on this special plea and what is the function of the law, and Mr. Weyer's point is a good one that there should be no confusion about this. Q. Doctor, going back now, I asked you if you had an opinion as to this man's mental condition during the period of time in which these two killings took place. I would ask you, do you have an opinion as to this man's knowledge of being able to distinguish between right and wrong during the period of time in which these two killings took place? A. It is my opinion that this man basically always knew, at least intellectually he knew the difference between right and wrong; however, emotionally he was developed to such a point that the intellectual knowledge did not restrain him from acting out— MR. WEYER: Note the same objection, that this be stricken. I mean, not this last question, but the previous questions is what my objection goes to. THE COURT: I think I will let the answer stand. If at the conclusion of the direct and cross-examination the defense counsel feels that a cautionary instruction should be given, —maybe I had better give a preliminary one right now, and it can be supplemented later, if necessary.

"Members of the jury, the court, as I think you know by this time, will later instruct you in writing with reference to the issues raised by this special plea of mental irresponsibility. Now, the doctor has referred to certain rules which he first called the McNaghten rules, and then testified about his familiarity with the tests, of which he said the law prescribes, that the person in substance must have the ability to distinguish between right and wrong with reference to the act charged. Now, that isn't his precise language but he referred to these legal tests.

"Now, the court has permitted his answer to stand so that you may know what the witness has in mind when he is giving his opinion. The court is not allowing that answer to stand as the final definition of what the legal test is. You will find that later on in the instructions, but when an expert witness gives his opinion, the jury is entitled to know what he has in mind when he is giving that opinion and on what his opinion is based, and it is for that reason that the court has allowed the answers thus far to stand.

"When he is talking about the so-called right and wrong test or the McNaghten rules and so forth, you should not interpret that as the authoritative definition of what test the law applies in this case. You will consider that language

in connection with the instructions which you will later get, in evaluating his opinion and understanding what he means by the language used."

We have set forth the entire portion of the record relating to assignment No. 8 in order that Dr. Garre's reference to the law relating to the test of legal sanity may be viewed in its proper perspective.

 The trial court denied appellant's motions to strike this portion of the witness' testimony but did, at that time, explain to the jury fully its reasons for permitting the witness' testimony to stand. It instructed the jury that they should not interpret the witness' reference to the so-called right and wrong test or the M'Naghten rules as an authoritative definition of the test of insanity to be applied in this case.

In our opinion, this instruction definitely and clearly informed the jury as to the court's reasons for permitting the testimony to stand, and, also, that the rule of law applicable to the case on this point would be given them in the court's final instructions and not by the witness. We think that the court's statement to the jury at the time appellant's motions to strike were made was adequate to prevent the jury from being misled by the testimony of the witness.

As will be seen, the court did, at the conclusion of the trial, instruct the jury (instruction No. 33) that the right and wrong test (M'Naghten rule) should be applied by them to the facts of this case. That instruction will be discussed in connection with appellant's assignment of error No. 9. If instruction No. 33 should be approved, it would seem that the trial court's ruling in denying the motions to strike the portions of Dr. Garre's testimony referred to above was likewise correct and could not constitute reversible error.

Assignment No. 9:

Appellant contends that:

"The court erred in giving instruction No. 33 and further erred in failing to give the appellant's requested instruc-

tions on mental irresponsibility, which is the American Law Institute test for mental irresponsibility."

Instruction No. 33 told the jury that:

"You are instructed that the term 'mental irresponsibility', as used alternatively with the term 'insanity' in the further plea of the defendant and elsewhere in these instructions, means what is defined in law as criminal insanity. Therefore, if you find that the defendant was mentally irresponsible under the definition as contained herein, you must find the defendant not guilty by reason of mental irresponsibility.

"If the defendant is to be acquitted upon his plea of mental irresponsibility or insanity, he must convince you by a preponderance of the evidence that, at the time the crime is alleged to have been committed, his mind was diseased to such an extent that he was unable to perceive the moral qualities of the act with which he is charged, and was unable to tell right from wrong with reference to the particular act charged. A person may be sick or diseased in body or mind and yet be able to distinguish right from wrong with respect to a particular act."

Proposed instruction No. 21 (if substituted in place of No. 33) would have stated the rule as follows:

" 'You are instructed that the term "mental irresponsibility", as used alternatively with the term "insanity" in the further plea of the defendant and elsewhere in these instructions, means what is defined in law as criminal insanity. Therefore, if you find that the defendant was mentally irresponsible under the definition as contained herein, you must find the defendant not guilty by reason of mental irresponsibility.

" 'Mental irresponsibility means that the defendant is not responsible for the crimes charged herein if at the time of said crimes, as a result of mental disease or defect, he lacked substantial capacity either to appreciate the criminality of his act, or to conform his conduct to the requirements of law.

" 'The terms "mental disease" or "defect" do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct.' "

The essential difference between the two instructions is that the instruction which was given to the jury did not allow for an acquittal based on insanity or mental irrespon-

sibility, if the accused had cognition (the ability to understand the nature and quality of his acts) with regard to what he did, even though his volition (his capacity "to conform his conduct to the requirements of the law") may have been substantially impaired by mental disease or defect. In other words, under the given instruction, the defense of "not guilty by reason of mental irresponsibility" is not available to a person who has the ability to understand the nature and quality of his acts, but, because of mental disease or defect, is somehow unable to control his own behavior.[2]

The proposed but rejected instruction was based upon § 4.01 of the Model Penal Code, which test has since been adopted by the American Law Institute, on May 24, 1962. The concept that volitional control is an element of sanity for the purpose of criminal responsibility is accepted in several states. Some recognize "irresistible impulse" as a defense; others use language much like that found in the American Law Institute test. See, *e.g. People v. Carpenter*, 11 Ill. (2d) 60, 142 N. E. (2d) 11 (1957); *Commonwealth v. Chester*, 337 Mass. 702, 150 N. E. (2d) 914 (1958); and *Downs v. State*, 231 Ark. 466, 330 S. W. (2d) 281 (1959).

The instruction which was assigned as error (No. 33) is based on the M'Naghten rule, which is the law in the majority of states.

The question whether the jury was correctly instructed

---

[2]The point was made clear to the jury by the following instruction, to which no error was assigned and no exception taken:

"Irresistible impulse is not mental irresponsibility within the meaning of the law and is no defense. An irresistible impulse, as used herein, is an impulse induced by, and growing out of some mental disease affecting the volitive, as distinguished from the perceptive, powers, so that the person afflicted, while able to understand the nature and consequence of the act charged against him and to perceive that it is wrong, is unable, because of such mental disease, to resist the impulse to do it.

"It is to be distinguished from such a disease of the mind as renders a person unable to appreciate the nature and character of the act charged, and to understand whether it is right or wrong." Instruction No. 35.

This instruction became the law of the case.

is squarely presented by the facts of this case. There was substantial evidence from which the jury could have found that appellant could not control his own behavior, even though, at the time, he knew the difference between right and wrong.

As stated in appellant's brief, he, by the testimony of his witnesses and by documentary proof, presented to the jury a comprehensive history of his life from the time he was four months old until the date of trial.

This evidence showed the frustration that appellant experienced in his relationship with his foster mother who alternately was indulgent with him and then angrily rejected him completely.

Appellant introduced in evidence many reports and other documents relating to his experiences at various schools he attended and correctional institutions to which he was sent. Among these was the report of the Ryther Child Center, to which he was referred at the age of fourteen years for psychiatric treatment. While at Ryther, a complete psychiatric and psychological work-up was done on appellant in 1951. Dr. Charles A. Maugham, who did the evaluation, concluded that appellant would end up either in prison or in a state hospital if not treated.

Ryther could not control appellant, and it was decided to transfer him to a setting which could better protect him and the community. He was transferred to Luther Burbank School. It was far from ideal, but there were no better facilities available. The records of the Seattle Public Schools Guidance Service show his experiences during his year at the Luther Burbank School for Boys, after which he was paroled to his mother. Two months later he was remanded to the juvenile court and was sent to the state institution for boys at Chehalis, and from there to the forestry camp. Thereafter, appellant joined the Army and served overseas. He contracted syphilis, and, after getting into considerable trouble, was separated from the service with an undesirable discharge. On appellant's return from the Army to his home in Seattle, he soon got into further difficulty with the law and was sentenced to the Monroe

Reformatory. Up until this time he had had a record of burglaries, fighting, larceny, prowling, riding in stolen cars and auto thefts. He was released on parole in March, 1959, and returned to Seattle. His parole officer testified that, in June, 1959, he assaulted his foster mother and threatened to burn her house down. He also testified that, during this period, appellant made serious attempts to obtain employment but failed to get a job because of the parole officer's heavy case load and the reluctance of employers to hire parolees. He said that appellant had violated his parole in several respects but he was not sent back to the reformatory, although he had asked the parole officer to lock him up because he did not think he could get along if he remained at liberty.

In summary, then, appellant's history is a history of lack of control. First, his parents failed to control him. The situation is summarized by Abram Kardiner, "When the State Brings Up the Child," Saturday Review, August 26, 1961:

". . . Eventually the child comes to recognize the parents as the benevolent mediator between his weak self and what would otherwise be a hostile world. This leads, first, to the idealization of the parent and to an enhancement of his authority to impose discipline, and ultimately to the development of what we call conscience. Should this pattern fail to occur, the only remaining implement of social control is fear of punishment, which must rest either on institutional pressures or on the police. The absence of the usual attitudes toward the parent, for whatever reason, creates a child with an emotional deficiency that may well make him socially ineducable."

Next, our institutions did not provide the necessary controls. Due to inadequate facilities, appellant was released, time after time, to make room for others.

Appellant called as expert witnesses a psychologist and two psychiatrists, each of whom had examined him extensively and had reviewed the several reports and other documents relating to his experiences at schools and correctional institutions which had been admitted in evidence.

Each witness testified at length concerning the factual

basis for the opinion he stated as to appellant's mental condition.

The psychologist declined to express an opinion based on the right and wrong test, but stated that, in his opinion, at the time the crimes charged occurred, appellant's knowledge of right and wrong was not functioning so as to influence his behavior and that he did not have the will or the power to resist emotional impulses.

Dr. Sutch, the first psychiatrist called by the defense, in expressing his opinion, testified that appellant, at the times the crimes charged occurred, had a psychotic schizophrenic reaction which is chronic, recurrent, and episodic, and that his contact with reality was nonexistent.

Dr. Schwartz, the second psychiatrist called to testify, reviewed appellant's background and experience (to which reference has been made above) and stated that, beginning in March, 1939, appellant's ability to control himself gradually diminished and at the times of the alleged crimes he was in no position psychologically to act on his knowledge. The witness could not answer the question whether appellant then knew right from wrong. He expressed the opinion that, when Mrs. Jumper banged shut the door of the metal dryer, that event probably triggered appellant's psychotic outburst.

All of these expert witnesses agreed that appellant's prognosis for cure was very poor.

Before the two tests between which the trial court was compelled to make a choice are discussed, a third test should be mentioned. That third test is the "product" test, often called the *Durham* rule because of the widespread notoriety it received upon being adopted in the District of Columbia in *Durham v. United States*, 94 App. D. C. 228, 214 F. (2d) 862, 45 A. L. R. (2d) 1430 (1954). In essence, this rule is that a defendant in a criminal case is not responsible if his unlawful act was the product of a mental disease or mental defect. The rule in New Hampshire has been stated in the same way for over ninety years. *State v. Pike*, 49 N. H. 399, 6 Am. Rep. 533 (1870), and *State v. Jones*, 50 N. H. 369, 9 Am. Rep. 242 (1871).

However, very recently the Court of Appeals in the District of Columbia has gone far beyond the original Durham rule as it was first adopted by that court in 1954.

In *Campbell v. United States*, 307 F. (2d) 597 (C. A. D. C. March 29, 1962), the conviction of a defendant with an "emotionally unstable personality" (administratively classified by government psychiatrists as a mental disease since 1957) was reversed. It was held by the majority that the instructions of the trial court placed too much emphasis upon the defendant's capacity to control his own behavior, rather than simply instructing the jury that they must determine whether the criminal act was a product of a mental disease. They say that the test is whether he would have committed the act if he had not been the victim of a mental disease, to wit, an emotionally unstable personality. Thus, they hold that the defendant could be found innocent if his motivation was the result of such mental disease, regardless of whether or not the sanctions of the criminal law as a deterrent could have influenced him.

The fallacy in that view, as pointed out by Judge Burger in his very vigorous dissent, is that almost all criminals could come under such a definition of insanity. Not only is emotional instability a mental disease, according to the majority in *Campbell*, but, in *Blocker v. United States*, 288 F. (2d) 853 (1961), the District of Columbia Court of Appeals said the same of sociopathic personalities, who are now classified by some psychiatrists as insane merely because they display symptoms of being antisocial, *i.e.* recidivistic law breakers.

The majority of the Court of Appeals in the District of Columbia apparently believe that a person whose motivations are the result of a disturbed mind is not morally blameworthy, and, therefore, is not subject to criminal sanctions. Such a conclusion must be based upon a notion that the criminal law is primarily a means of social retribution, rather than a system of social controls. Only under such a view could the test for criminal responsibility be based on sympathy, rather than upon the potential influence which criminal sanctions might have upon the offender.

The implications of the *Campbell* decision are enormous. It is sufficient for our purposes to say that, in the State of Washington, we must rely on the statutory criminal law as an instrument of social control until the legislature decides otherwise. Until that time, the definition of criminal responsibility must remain a legal question.

" . . . When we say that the standard of criminal responsibility is a legal rather than a medical or scientific problem, we are saying that in a larger sense it is a social question in that it is established to regulate the social order. . . ." Concurring opinion of Judge Burger in *Blocker v. United States, supra.*

Two other judges agreed with Judge Burger as to the need of a change from the Durham rule.

Other federal circuit courts which have abandoned M'Naghten have adopted tests which are the same in substance as the test which was proposed by appellant in this case. See *United States v. Cain,* 298 F. (2d) 934 (C. A. 7th) (1962); *United States v. Currens,* 290 F. (2d) 751 (C. A. 3rd) (1961); *Dusky v. United States,* 295 F. (2d) 743 (C. A. 8th) (1961), cert. den. 368 U. S. 998, 7 L. Ed. (2d) 536, 82 S. Ct. 625.[3]

The question before us is whether we, as the majority of jurisdictions,[4] should refuse to extend absolute immunity from criminal responsibility to persons who, although capable of understanding the nature and quality of the acts (the ability to distinguish between right and wrong), are unable to control their own behavior as a result of mental disease or defect.

---

[3]The United States Courts of Appeal are sharply divided on this issue. For example, the ninth circuit has retained M'Naghten. *Andersen v. United States,* 237 F. (2d) 118 (1956); *Sauer v. United States,* 241 F. (2d) 640 (1957). The United States Supreme Court has not committed itself on this question. *Leland v. Oregon,* 343 U. S. 790, 96 L. Ed. 1302, 72 S. Ct. 1002 (1952); *Matheson v. United States,* 227 U. S. 540, 57 L. Ed. 631, 33 S. Ct. 355 (1913); *Davis v. United States,* 165 U. S. 373, 41 L. Ed. 750, 17 S. Ct. 360 (1897). With regard to the rule in the several states, Appendix A, page 161 of tentative draft No. 4 of the Model Penal Code, lists thirty jurisdictions using the right-wrong test and fourteen more using it plus the irresistible impulse test.

[4]The most recent case in which the M'Naghten test was retained is *State v. Esser,* 115 N. W. (2d) 505 (Wis. 1962).

Our starting point is our statute, RCW chapter 10.76, originally enacted as Laws of 1907, chapter 30. Especially pertinent to this discussion are RCW 10.76.010 and 10.76.030, which follow:

"Any person who shall have committed a crime while insane, or in a condition of mental irresponsibility, and in whom such insanity or mental irresponsibility continues to exist, shall be deemed criminally insane within the meaning of this chapter. No condition of mind induced by the voluntary act of a person charged with a crime shall be deemed mental irresponsibility within the meaning of this chapter." RCW 10.76.010.

"If the plea of insanity or mental irresponsibility be interposed, and evidence upon that issue be given, the court shall instruct the jury when giving the charge, that in case a verdict of acquittal of the crime charged be returned, they shall also return special verdicts finding (1) whether the defendant committed the crime and if so, (2) whether they acquit him because of his insanity or mental irresponsibility at the time of its commission, (3) whether the insanity or mental irresponsibility continues and exists at the time of the trial, and (4) whether, if such condition of insanity or mental irresponsibility does not exist at the time of the trial, there is such likelihood of a relapse or recurrence of the insane or mental irresponsible condition, that the defendant is not a safe person to be at large. Forms for the return of the special verdicts shall be submitted to the jury with the forms for the general verdicts." RCW 10.76.030.

We have set out in full the language of RCW 10.76.030 to show that the legislature has provided for the protection of the public even against criminally insane persons who commit acts which are prohibited by the criminal law.

What is meant by "criminal insanity" and "mental irresponsibility" in our statute? It has consistently been held that both terms mean the same thing for purposes of criminal responsibility. The test is M'Naghten. *State v. Collins*, 50 Wn. (2d) 740, 314 P. (2d) 660 (1957), and cases cited therein. *State v. Maish*, 29 Wn. (2d) 52, 185 P. (2d) 486, 173 A. L. R. 382 (1947), made it especially clear that Washington has rejected the volitional test as embodied in the so-called "irresistible impulse" rule.

The decision in the *Collins* case contains a thorough discussion of this problem. However, appellant argues that our language in that case indicated that we were then "open-minded" on the question. In that case at page 753, we said:

"Recognizing the wide variance of the frequent mental or emotional disturbances from which everyone suffers, we have, for the purpose of judicial administration, adopted various tests or standards to determine whether individuals have the mental capacity to contract, to marry, to make a will, to participate intelligently in their own defense, or to form a criminal intent. Certain other tests or standards have to be met before society will take the life of an individual who has been sentenced to death. Our search is for practical rules that enable us to determine whether a contract should be enforced, a marriage validated, a will upheld, a trial conducted, a defendant in a criminal case held responsible for his offense, or a death sentence executed.

"In the particular area with which we are dealing, we are of course, concerned with the proper care of the mentally ill killer, robber, or rapist; but we are more concerned—and should be—with the security of society and its protection from such offenses and offenders. The law inquires not into the peculiar constitution of mind of the accused, or the mental weaknesses or disorders or defects with which he may be afflicted, but solely into the question of his capacity, at the time he committed a forbidden act, to have a criminal intent.

"On the question of the existence of a better method to determine that intent than the right-and-wrong test, we have an open mind. . . ."

In order to foreclose any doubt as to the matter, we shall discuss the issue of the continued validity of M'Naghten in this state.

Before we proceed to a discussion of the arguments pro and con, certain prefatory and cautionary remarks must be made in order to confine the issues within their proper scope.

First, capital punishment is not an issue, and the arguments for and against the death penalty are not relevant here. They were made to the jury by both counsel.

" . . . We should be looking for a rule that would be generally applicable to offenders who survive, and that would be useful in dealing with them constructively." Sol Rubin, "A New Approach to M'Naghten v. Durham," 45 J. Am. Jud. Soc'y 133.

Second, the question is not what kind of treatment or punishment will or should be received by persons convicted of crimes. Matters of sentencing—what will best promote rehabilitation of the individual or the protection of society or whether this state should adopt the Model Sentencing Act, etc.—are matters of public policy which are solely within the province of the legislature.

Third, the issue before us is who will be *completely exculpated* by his mental disease or defect. The presence of a mental disease or defect which falls short of criminal insanity may well be relevant to issues involving the elements or degrees of certain crimes, *e.g.*, where malice, premeditation or intent are in issue. An accused who has the necessary *capacity* to premeditate, for instance, may still introduce evidence that he is suffering from a mental disease or defect, which disease or defect substantially reduces the probability that he actually did premeditate with regard to the crime with which he is charged.[5] (See *People v. Gorshen*, 51 Cal. (2d) 716, 336 P. (2d) 492 (1959); and *People v. Wells*, 33 Cal. (2d) 330, 202 P. (2d) 53 (1949), cert. den. 338 U. S. 836, 94 L. Ed. 510, 70 S. Ct. 43, for cases in a jurisdiction which formerly had some trouble on this point.) We are examining the test which must be met in this state under our present statutes in order to support a finding of "not guilty by reason of mental irresponsibility," which would completely absolve a defendant of any criminal responsibility.

With the scope of the argument thus considerably narrowed, most of the arguments which are generally advanced in favor of changing the legal definition of insanity are no longer relevant.

One argument for such change is that we must take ad-

---

[5] Counsel for appellant properly argued to the jury along these lines.

vantage of new developments in psychiatry. There is nothing new about the idea that some people who know what they are doing still cannot control their actions. In fact, acceptance by a court of law of the idea that such people should be relieved of criminal responsibility led to the adoption of the M'Naghten rule in England. (See Arthur Koestler, Reflections on Hanging, chapter 4, for a critical, but highly readable, history of the development of the M'Naghten rule.)

We reiterate that there is no reason why the legal definition of insanity should keep up with the medical definition of insanity. The term has a different meaning and a different purpose in each context. The only arguments that should be considered are those arguments which are relevant to the question of what kind, or degree, of mental disease or defect should relieve a person of criminal responsibility for his acts.

This brings us to the crucial argument for change. It is contended that if a man does not have control over his own behavior, he has no free will and cannot be blamed for his misbehavior. Therefore, the interests of both society and the individual defendant would best be served if such a defendant were not held criminally responsible for his actions. It is the latter part of this contention that we feel merits full consideration.

The answers to this crucial contention are several, and each is alone sufficient, in our opinion, to dispose of it. First, the legislature has established a policy in this state that only the most extreme degree of insanity will relieve a defendant of criminal liability. Any arguments for change in policy should, therefore, be addressed to the legislature. Second, the test proposed by appellant is extremely difficult to apply. Third, from the point of view of social utility and the purposes of the criminal law, the M'Naghten test is preferable to the American Law Institute test. Each of these reasons, in turn, will be discussed more fully.

The M'Naghten rule was the test for criminal insanity currently approved by this court when the present statute was enacted in 1907. By laws of 1909, chapter 249,

§ 7, the legislature attempted to abolish insanity as a defense in criminal cases:

"It shall be no defense to a person charged with the commission of a crime, that at the time of its commission, he was unable by reason of his insanity, idiocy or imbecility to comprehend the nature and quality of the act committed, or to understand that it was wrong; or that he was afflicted with a morbid propensity to commit prohibited acts; nor shall any testimony or other proof thereof be admitted in evidence."

In *State v. Strasburg*, 60 Wash. 106, 110 Pac. 1020 (1910), we held that statute to be unconstitutional. Thus the only reason insanity is a defense to crimes in Washington is that the minimum requirements of mens rea have been held by this court to compel it. The legislature's attempt to abolish insanity as a defense indicates to us that the established policy in this state is to strictly limit the application of that defense. This the M'Naghten rule does.

The considerations of stare decisis reinforce this argument. As the cases cited in *State v. Collins*, *supra*, reveal, we have consistently placed the same meaning on our statute. Cases since *Collins* have continued to follow the rule. See, *e.g.*, *State v. Murphy*, 56 Wn. (2d) 761, 355 P. (2d) 323 (1960). See, also, *In re Bonner v. Rhay*, 57 Wn. (2d) 670, 359 P. (2d) 157 (1961).

Since insanity is available as a complete defense only because it has been held to be a constitutional right, we cannot extend that defense beyond the minimum which is constitutionally required. Therefore, the defense is available only to those persons who have lost contact with reality so completely that they are beyond any of the influences of the criminal law.

The social policy behind a minimized insanity defense is partially explained in Wechsler, "The Criteria of Criminal Responsibility," 22 U. Chi. L. Rev. 367 (1955):

"The purpose of the penal law is to express a formal social condemnation of forbidden conduct, buttressed by sanctions calculated to prevent it—not alone by incapacitating and so far as possible correcting the offending individual, but also by their impact on the general imagination,

*i.e.*, through the medium of general deterrence. Considerations of equality and of effectiveness conspire to demand that sanctions which are threatened generally be applied with generality upon conviction—not that the sentence disregard differences in circumstances or in individuals but that the sentence be imposed within the framework of such formal condemnation and conviction. Responsibility criteria define a broad exception. The theory of the exception is that it is futile thus to threaten and condemn persons who through no fault of their own are wholly beyond the range of influence of threatened sanctions of this kind. So long as there is any chance that the preventive influence may operate, it is essential to maintain the threat. If it is not maintained, the influence of the entire system is diminished upon those who have the requisite capacity, albeit that they sometimes may offend.

"On this analysis, the category of the irresponsible must be defined in extreme terms. The problem is to differentiate between the wholly non-deterrable and persons who are more or less susceptible to influence by law. The category must be so extreme that to the ordinary man, burdened by passion and beset by large temptations, the exculpation of the irresponsibilities bespeaks no weakness in the law. . . ."

The classic criticism of "irresistible impulse" — which applies also to any test which includes volition (such as the American Law Institute test)—is that such a test is extremely hard to apply with any hope of reasonable accuracy. In *Commonwealth v. Woodhouse*, 401 Pa. 242, 164 A. (2d) 98 (1960), the court said:

"The 'Irresistible Impulse' test also has its decriers: See Davidson, Irresistible Impulse and Criminal Responsibility, 1 J. For. Sci. No. 1 Apr. 1956; Hall and Menninger, 'Psychiatry and the Law'—A Dual Review, 38 Iowa L. Rev. 687; Hall, Responsibility and Law, Defense of the M'Naghten Rules, 42 A. B. A. J. 917; and, Waedler, Psychiatry and the Problem of Criminal Responsibility, 101 U. of Pa. L. Rev. 378 et seq. They ask, for instance, supposing the power to resist is only impaired, would this prove irresponsibility? All men are subject to strong urges of various descriptions. Would this reduce 'Irresistible Impulse' to something that is not psychopathic at all? Others suggest that it is impossible, in any particular case, to say that an impulse was irresistible; all that can be said is that the impulse did not

appear to have been successfully resisted. 'The difficulty of distinguishing between uncontrolled impulse and the impulse that is not controlled would take too fertile a dialectorial field': Henderson, Psychiatry and The Criminal Law, 4 Psychiatric q. 103; Hamblen Smith, Psychology and The Criminal, 179.''

In *State v. Lucas*, 30 N. J. 37, 152 A. (2d) 50 (1959), the New Jersey court said:

"Until such time as we are convinced by a firm foundation in scientific fact that a test for criminal responsibility other than M'Naghten will serve the basic end of our criminal jurisprudence, *i.e.*, the protection of society from grievous and anti-social acts, we shall adhere to it. . . .''

See, also, *People v. Nash*, 52 Cal. (2d) 36, 338 P. (2d) 416 (1959), and *State v. Crose*, 88 Ariz. 389, 357 P. (2d) 136 (1960).

With regard to capacity to control one's behavior, it would appear that there is no more psychiatric certainty today than there was when this court decided *State v. Maish, supra.*

Finally, M'Naghten is preferable to the American Law Institute test in that the M'Naghten rule better serves the basic purpose of the criminal law—to minimize crime in society. The earlier quotation from Wechsler pointed out that, when M'Naghten is used, all who might possibly be deterred from the commission of criminal acts are included within the sanctions of the criminal law. Sol Rubin points out that the application of the M'Naghten rule can even help in the rehabilitation process:

" . . . The M'Naghten rule declares that one who is so far removed from reality that he does not know the nature of his act does not have the mentality to be adjudged responsible. Such a holding is inevitable because of the requirement of *mens rea*. But the Durham rule would exculpate a defendant who does know the nature of his act. For the law to tell such a person that he is not responsible for his act is likely to deter and complicate his rehabilitation, because it contradicts common sense fact. To declare that such a defendant is legally responsible, but, because of his mental illness, is subject to special treatment is more consistent with reality and more likely to sup-

port his rehabilitation. . . ." "A New Approach to M'Naghten v. Durham," 45 J. Am. Jud. Soc'y 133, 136 (December, 1961).

Mr. Rubin then continues the discussion of this subject in his article and supports his position with cogent reasoning.

In summary, then, not only would any other rule be difficult to apply, but the M'Naghten rule is, for good reason, the established rule in the State of Washington. There was no error in giving the jury the instruction (No. 33) based on that test, nor in refusing to instruct on the basis of any other test of mental responsibility as requested by appellant.

ASSIGNMENT No. 10:

In this assignment, appellant asserts that he was prevented from having a fair trial as to count 1 of the information because the trial court gave instruction No. 11, in which the jury was told:

"You are instructed that under the evidence of this case the killing of Alice Jumper was neither justifiable nor excusable."

Appellant contends that this instruction was not only unnecessary but was confusing because the jury may have thought that it applied to his defense of mental irresponsibility. He further argues that instruction No. 11 simply nullified instruction No. 10 which defined excusable and justifiable homicide.

The state's answer to appellant's contentions is that the evidence in the case at bar showed no justification or excuse for the killing of Alice Jumper, and hence instruction No. 11 was proper under *State v. Griffith*, 52 Wn. (2d) 721, 328 P. (2d) 897 (1958), and RCW 9.48.150 *et seq.*

Furthermore, it is pointed out by the state that, when the court's instructions are read in context as a whole, the jury could not have been misled into believing that the plea of mental irresponsibility was involved or in any way connected with the terms "excusable killing" or "justifiable killing." Instruction No. 10 contained the statutory definitions of excusable and justifiable homicide.

The defense of mental irresponsibility was explained to

the jury in six instructions, in three of which the jury was instructed to acquit appellant if they found that he were mentally irresponsible. The forms of verdict submitted to the jury clearly showed that the defense of mental irresponsibility was to be included in their deliberations and had not been eliminated by instruction No. 11.

We find no reversible error in the giving of instruction No. 11.

Assignment No. 11:

This assignment relates to the denial of appellant's motions for arrest of judgment and for a new trial. In view of our holdings as to the first ten assignments of error, no separate discussion of this assignment is necessary.

CONCLUSION

We have carefully considered each of appellant's assignments of error in the light of the record and the law applicable thereto. We are of the opinion that appellant had a fair trial. Finding no reversible error in the record, the judgment and sentence of the trial court entered upon the several verdicts of the jury must be affirmed.

The two attorneys who were appointed by the trial court to represent appellant at his trial, and who have continued to represent him on this appeal, have ably performed a stupendous task without compensation. We wish to express this court's appreciation for their efficient and capable professional services rendered, in the finest tradition of the profession, on behalf of an indigent person accused of a capital offense.

The judgment and sentence is hereby affirmed.

Weaver, Rosellini, and Ott, JJ., concur.

Hill, J. (concurring specially)—I concur in the majority opinion. However, I find myself in accord with some of the views expressed by Chief Justice Weintraub of the Supreme court of New Jersey, in a concurring opinion in *State v. Lucas* (1959), 30 N. J. 37, 152 A. (2d) 50; he says (p. 83):

"No one will dispute that society must be protected from the insane as well as the sane. The area of disagreement

is whether a civil or a criminal process should be employed when forbidden acts have been committed. If we could think of a conviction simply as a finding that the mortal in question has demonstrated his capacity for anti-social conduct, most of the battle would be decided. What would remain is the employment of such post-conviction techniques as would redeem the offender if he can be redeemed and secure him if he cannot. The proposal before us, however, does not relate to post-conviction disposition but rather to the question whether the criminal process shall be invoked to adjudge a basis for deprivation of liberty. It is in that frame of reference that we are asked to abandon *M'Naghten* in favor of another concept of insanity which will excuse. . . ."

Obviously, the "post-conviction techniques" cannot operate if the death penalty is imposed. I quote again (p. 87):

"For all practical purposes the furor over *M'Naghten* is confined to the disposition of offenders convicted of murder. It is the death penalty which sparks the quarrel. Whatever may be their thesis of personal blameworthiness and of justice to the individual, I should think that all thoughtful persons would at least pause when judging a man at the portal of death. All doubts must congregate there. The ultimate responsibility with respect to capital punishment is, of course, legislative. But there is an area within the present statutory scheme in which the judiciary can and should move to accommodate the divergent views. I refer to the admission of full psychiatric testimony for the jury's consideration in determining whether a man should live or die.

"I have no doubt that such testimony belongs in the case for that purpose. I am convinced the Legislature so intended when in resolving a controversy over capital punishment it provided that the jury shall fix the punishment. *State v. White*, 27 N. J. 158 (1958). The mental condition of a man is so inseparable from the issue of a just disposition—just to him and to society—that it is inconceivable that the Legislature intended to exclude it.

"The functions of the mind are an integral part of the criminal event itself. The law requires a *mens rea*. The specific mental operations necessary for guilt, be they premeditation, deliberation, and willfulness, or a felonious intent in a felony murder, cannot be isolated from the total functions of the mind of the offender. To limit the proof to that part of the total mental activity which technically

bears upon the issue of guilt is to conceal part of the event itself. The whole truth should be disclosed so that in deciding the question of life or death the jurors will know who it is who stands before them. That disclosure is necessary for the moral judgment the jurors must reach."

To follow this suggestion would remove the "straight jacket" of the legal concept of insanity of which the psychiatrists justifiably complain, so that in deciding the question of life or death the jurors will know, as Chief Justice Weintraub says, "who it is who stands before them." On the issue of guilt, the issue should continue to be as stated in the instructions given in this case.

HUNTER, J. (concurring in part and dissenting in part)— I concur with the majority in its disposition of all the assignments of error except those which relate to the submission to the jury of the defendant's defense of mental irresponsibility. To these I dissent.

The majority have approved an instruction embodying the so-called "right and wrong" test. For the purposes of accuracy, I would point out that the instruction given by the trial court, contrary to the majority's assumption, is not the exact test of legal insanity as formulated by The Opinion of the Judges in M'Naghten's Case, 10 Clark & F. 200, 8 Eng. Rep. 718 (H. L. 1843). The trial court instructed the jury that the defendant should be acquitted if

". . . at the time the crime is alleged to have been committed, his mind was diseased to such an extent that *he was unable to perceive the moral qualities of the act with which he is charged*, and was unable to tell right from wrong with reference to the particular act charged. . . ." (Italics mine.)

The M'Naghten rule states:

". . . it must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, *as not to know the nature and quality of the act he was doing*; or, if he did know it, that he did not know he was doing what was wrong. . . ." (Italics mine.)

I do not understand the italicized portions of the above two excerpts to have synonymous meaning. Moreover, the trial court's language regarding perception of "moral qualities" appears to be substantially synonymous with its further language regarding the ability to tell "right from wrong." Hence, the trial court's instruction was not a complete statement of the M'Naghten rule. I will elaborate on the significance of this observation as I develop my points of departure from the majority's views.

I fully agree with the majority that this court is unqualifiedly presented with the question whether the defense of mental irresponsibility should be available to persons who are, by reason of mental illness, unable to rationally *control* their behavior, but who at the time of the act have the capacity to understand the difference between right and wrong in terms of society's standards. I also agree with the majority that the proper approach to this question must begin with the pertinent statutes. RCW 10.76.010, RCW 10.76.030 and RCW 10.76.040 have codified the common law rule which recognized mental irresponsibility as a defense to a criminal charge. These enactments go no further than recognizing that the defense of mental irresponsibility is available, and setting up certain procedures to implement it. Wisely, the matter of defining the term "mental irresponsibility" was left untouched; it is properly a judicial matter to be solved through the process of criminal trials with the aid of expert testimony.

It is true that in 1909 the legislature attempted to eliminate mental irresponsibility as a defense to a criminal charge and that this court, in *State v. Strasburg*, 60 Wash. 106, 110 Pac. 1020 (1910), held the enactment to be unconstitutional. This court reasoned that the element of mens rea or "guilty mind," constitutionally cannot be ignored and that mental irresponsibility, which negates the existence of mens rea, cannot, therefore, be abolished as a defense. We have never before stated nor intimated that the "right and wrong" test is a constitutional minimum, and I see no reason to conclude that our legislature has evidenced a desire that this state retain the "right and wrong" test. The

statutes concerning the defense of mental irresponsibility, under which we now operate, were passed in 1907. The legislature did not then inform this court, nor has it since informed this court, as to how we should define or view the concept of mens rea in implementing the defense of mental irresponsibility. The *Strasburg* case, *supra,* confirmed that mens rea cannot be eliminated as an element of crime. The delineation of that concept is a judicial function.

In *State v. Collins,* 50 Wn. (2d) 740, 314 P. (2d) 660 (1957), we expressed an attitude which ought to govern the manner in which we dispose of this issue:

" . . . The law inquires not into the peculiar constitution of mind of the accused, or the mental weaknesses or disorders or defects with which he may be afflicted, but solely into the question of his capacity, at the time he committed a forbidden act, to have a criminal intent.

"On the question of the existence of a better method to determine that intent than the right-and-wrong test, we have an open mind. . . ."

I am convinced that both the M'Naghten rule, as laid down in 1843, and the "right and wrong" test given in the trial court's instruction are inadequate and erroneous formulae for acquainting the jury with the meaning of criminal intent (mens rea). I am also convinced that a better formula is available.

The majority have explained that the social policy underlying the notion of criminal responsibility is to maintain a threat of sanctions to deter those persons who have the capacity to be influenced by society's standards of right and wrong. To this I subscribe. But I disagree with the majority's conclusion that the minimization of crime in society is served if we retain the "right and wrong" test as a definition of mental irresponsibility. If, due to mental illness, a person cannot control his behavior (although he is aware or capable of knowing what society considers to be wrongful conduct), then certainly the criminal law cannot serve as an influence to his conduct and the "right and wrong" test does not achieve its asserted purpose.

Mens rea or criminal intent not only requires that one have the capacity to understand society's standards of right and wrong, but also requires that one have the capacity to apply his faculty of knowledge and understanding to his decision as to a course of action. If the latter capacity is absent due to mental illness, then such a person cannot be possessed of mens rea. To use the terms of the majority, *volition*, as well as *cognition*, is an element of criminal intent. In *United States v. Currens*, 290 F. (2d) 751 (1961), in a very comprehensive and enlightening opinion by Chief Judge Biggs, the court rejected the M'Naghten rule as a test for mental irresponsibility and based its conclusion, in part, on the ground that the M'Naghten rule does not recognize the volitional element as a prerequisite to criminal intent.

"The concept of *mens rea*, guilty mind, is based on the assumption that a person has a capacity to control his behavior and to choose between alternative courses of conduct. This assumption, though not unquestioned by theologians, philosophers and scientists, is necessary to the maintenance and administration of social controls. It is only through this assumption that society has found it possible to impose duties and create liabilities designed to safeguard persons and property. [Cases omitted.] Essentially these duties and liabilities are intended to operate upon the human capacity for choice and control of conduct so as to inhibit and deter socially harmful conduct. When a person possessing capacity for choice and control, nevertheless breaches a duty of this type he is subjected to the sanctions of the criminal law. He is subjected to these sanctions not because of the act alone, but because of his failure to exercise his capacity to control his behaviour in conformity with the demands of society. For example, an act of homicide will create no liability, only civil liability or varying criminal liability depending on the nature of the mental concomitant of the act. Generally, the greater the defendant's capacity for control of his conduct and the more clearly it appears that he exercised his power of choice in acting, the more severe is the penalty imposed by society. Thus, the sanctions of the criminal law are meted out in accordance with the actor's capacity to conform his conduct to society's standards, through the capacity for choice and control which he possessed with respect to his act.

"It follows, we believe, that where there is a reasonable doubt as to whether a particular person possesses capacity of choice and control, i.e., capacity to conform his conduct to society's standards there is a reasonable doubt as to whether he possessed the necessary guilty mind. A test for criminal responsibility should incorporate this analysis insofar as it is helpful as a means by which the jury can relate a defendant's mental disease to the concept of the guilty mind. It should be made clear to the jury that the fact that a defendant was mentally diseased is not determinative of criminal responsibility in and of itself but is significant only insofar as it indicates the extent to which the particular defendant lacked normal powers of control and choice at the time he committed the criminal conduct with which he is charged. In other words the test must provide the jury with a verbal tool by which it can relate the defendant's mental disease to his total personality and by means of which it can render an ultimate social and moral judgment."

Some students in this area have argued that the original M'Naghten test does not ignore the volitional element of mens rea, but embraces that element in the phrase "as not to know the nature and quality of the act he was doing." See Mueller, *M'Naghten Remains Irreplaceable: Recent Events In The Law Of Incapacity*, 50 Geo. L. J. 105 (1961). This view appears very unpersuasive, mainly because the quoted phrase from the M'Naghten rule is put in terms of *knowledge* rather than *control* or *choice*. However, even if it be true that the M'Naghten judges were making an attempt to express the volitional element of mens rea in their test of mental irresponsibility, that fact cannot validate an extremely outdated formula. Furthermore, it is certain that the instruction given by the trial court in the instant case did ignore the volitional element of mens rea.

In essence then, the "right and wrong" test is inadequate as a "verbal tool" because it is based upon a false concept of the human psyche. It cannot stand as a test for determining the guilt of one who defends on the ground of mental irresponsibility because it fails to recognize what the modern science of psychology has unquestionably revealed, *i.e.*, that the human personality is a complex integrated system where cognitive, volitional and emotional elements are in-

extricably intertwined. The mind is not divided into separate compartments containing independent faculties of knowledge, reason and choice. Because the test of M'Naghten is couched solely in terms of knowledge and morality, the expert psychiatrist who is called to testify at the criminal trial is not free to present his views from a clinical approach which should be his proper role as an expert. Instead, he is called upon to answer questions of morality, matters which are foreign to his science and which should properly be left to the jury. See the array of authorities cited in *United States v. Currens, supra.*

The problem of devising an alternative to the M'Naghten rule is by no means simple. The indefinite concept of mens rea, the many questions yet unsettled by medical psychology, and the difficulty of relating an understandable and properly limited test to a jury make the quest for a solution complex. See Lindman and McIntyre, *The Mentally Disabled and The Law,* Ch. 11 (1961). However, uncertainty, which inevitably is a part of following new paths, should not cause this court to hold on to a test which is ineffective as an aid to the jury and not conducive to the ends of the criminal law.

The test of mental irresponsibility set forth in *United States v. Currens, supra,* meets the major objections to the M'Naghten rule, provides the necessary freedom for the expert psychiatric witness, and adequately relates the defense of mental irresponsibility to the main issues in the criminal trial. The jury ought to be instructed as follows: In order to acquit the defendant on the ground of mental irresponsibility you must be satisfied that at the time of committing the prohibited act the defendant, as a result of mental disease or defect, lacked substantial capacity to conform his conduct to the requirements of the law which he is alleged to have violated.

I also feel constrained to comment on the defendant's assignment of error No. 7, in which he contends the trial court erred in refusing to instruct the jury as follows:

"If you find that the defendant is not guilty by reason of mental irresponsibility, it is not for you to determine

what is to be done with him. That responsibility rests with the Department of Institutions not with the jury."

I agree with the majority that this proposed instruction incorrectly stated the law and, therefore, the trial court did not err in failing to submit it to the jury. However, due to the posture of this case and the reasons underlying this assignment of error, this matter should be brought into focus. I am of the opinion that, upon proper request, a defendant who pleads mental irresponsibility is entitled to have the jury informed, by way of instruction, as to the procedures in the state of Washington for the handling of those who are acquitted, but found by the jury unsafe to be at large in society. As the record in this case indicates, juries are acutely sensitive to the prospect of having dangerous persons at large and are tempted to "take the law into their own hands" in order to carry out what they may consider is their responsibility to protect society. In order to make the defense of mental irresponsibility a meaningful one, it is necessary to that end that juries be made aware of the social controls and machinery which the law provides for society's protection from a mentally irresponsible person who is unsafe to be at large.

Specifically, the defendant who pleads mental irresponsibility as a defense should be entitled to have the jury informed of the following: (1) Upon jury findings that he is not guilty by reason of mental irresponsibility and that such mental condition still exists or that because of the likelihood of relapse or recurrence he is unsafe to be at large, the court will order the defendant committed as a criminally insane person. (2) A person so committed shall not be discharged save upon the order of a court of competent jurisdiction made after a trial and judgment of discharge. (3) An order of discharge may be entered only after a trial before a jury in the court of the county that committed him, wherein it is found that he is a safe person to be at large. RCW 10.76.040, RCW 10.76.060, RCW 10-.76.070.

I would reverse the judgment of conviction and remand

the case for a new trial under appropriate instructions to the jury consistent with the views expressed herein.

FINLEY, C. J., and FOSTER, J., concur with HUNTER, J.

March 13, 1963. Petition for rehearing denied.